1

**JEFFREY S. YOUNG, SBN172016**
**LAW OFFICES OF JEFFREY S. YOUNG**

2

1307 State Street, First Floor
Santa Barbara, CA  93101

3

jeff@jeffreyyounglaw.com
Tel: (805) 884-0338

4

Fax: (805) 884-0799

5

Attorney for Plaintiff GREG YOUNG PUBLISHING, INC.

6

7

8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

10

11

GREG YOUNG PUBLISHING, INC., a corporation,

Case No. 2:16-cv-04587 SVW (KSx)

12

13

Plaintiff,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF GREG YOUNG PUBLISHING'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ZAZZLE'S FIRST AFFIRMATIVE DEFENSE FOR DMCA SAFE HARBOR PROTECTION

14

v.

15

16

ZAZZLE, INC., a corporation, and DOES 1 to 10,

17

18

Defendants

19

Date:                April 28, 2017
Time:                  1:30 p.m.
Judge:      Hon. Stephen V. Wilson
Dept.:                        10A

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1

## **TABLE OF CONTENTS**

2

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3

4

II.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5

  A.  Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6

  B.  Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

7

  C.   Defendant's Business Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8

III.  LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . .  8

9

  A.  Summary Judgment Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

10

11

  B.  The Digital Millennium Copyright Act (DMCA) . . . . . . . . . . . . . . . . . . . . .10

12

IV.   DMCA SAFE HARBOR DOES NOT APPLY TO ZAZZLE . . .. . . . . . . . 12

13

  A.  Zazzle is not a 'Service Provider'  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

14

15

  B.  Zazzle Does Not Qualify for the Safe Harbors as Required . . . . . . . . . . . 18
        by 17 U.S.C. § 512(c)(1)

16

17

18

    1.  Zazzle did have actual knowledge that copies of the GYP . . . . . . . . . . . 19
        Images or its activity using the GYP Images on the Zazzle
        system or network was infringing.

19

20

21

    2.  Zazzle received a financial benefit directly attributable to . . . . . . . . . . . . 20
        its infringing activity, in a case in which it had the right and
        ability to control such activity.

22

23

24

        a.  Zazzle received a financial benefit from the . . . . . . . . . . . . . . . .20
            infringing activity.
        b.  Zazzle had the right and ability to control the . . . . . . . . . . . . . . .22
            infringing activity

25

26

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

27

28

# TABLE OF AUTHORITIES

## Cases

*Addisu v. Fred Meyer* .........................................................................9
198 F.3d 1130, 1134 (9th Cir. 2000)

*Adickes v. S.H. Kress & Co.* ............................................................8
398 U.S. 144, 157 (1970)

*Agence France Presse v. Morel* ....................................................12
934 F. Supp. 2d 547, 565 (2013)

*ALS Scan, Inc. v. RemarQ Communities, Inc.* .................................14
239 F.3d 619, 625 (4th Cir. 2001)

*Anderson v. Liberty Lobby Inc.* .......................................................8,9
477 U.S. 242, 248 (1986)

*Arpin v. Santa Clara Valley Transp. Agency* ....................................9
261 F.3d 912, 919 (9th Cir. 2001)

*Balvage v. Ryderwood Improvement and Serv. Ass'n, Inc.* .............10
642 F.3d 765, 776 (9th Cir. 2011)

*Barnes v. AT & T Pension Ben. Plan-Nonbargained Program* .......... 9
718 F. Supp. 2d 1167, 1173 (N.D. Cal. 2010)

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) .....................8

*Clark v. Citizens of Humanity, LLC* .................................................17
F. Supp. 3d 1199 (S.D. Cal. 2015)

*Columbia Pictures Industries, Inc. v. Fung* .................................10,20
710 F.3d 1020 (9th Cir. 2013)

*Corbis Corp. v. Amazon.com, LLC* ............................................10,11,16, 20,22
351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004

*Cosmetic Ideas, Inc. v. IAC/Interactivecorp.* ....................................................10
606 F.3d 612 (9th Cir. 2010)

*Ellison v. Robertson* ........................................................................................10,11
357 F.3d 1072, 1076 (9th Cir. 2004)

*Fortyune v. American Multi-Cinema, Inc.* ............................................................8
364 F.3d 1075, 1080 (9th Cir. 2004)

*Gardner v. CafePress Inc.* .................................................................................14
2014 WL 794216 (S.D. Cal. 2014)

*Hendrickson v. Amazon.com, Inc.* ....................................................14, 16, 21, 22
298 F. Supp. 2d 914, 915 (C.D. Cal. 2003)

*Hendrickson v. eBay, Inc.* .................................................................................23
165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001)

*In re Aimster Copyright Litagation* .....................................................................12
252 F. Supp. 2d 634, 658 (N.D. Ill. 2002)

*In re Aimster Copyright Litigation* ......................................................................13
334 F.3d 643 (7th Cir. 2003)

*Jung v. FMC Corp.* .............................................................................................8
755 F.2d 708, 710 (9th Cir. 1985)

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* ..............................................9
475 U.S. 574, 586 (1986)

*Perfect 10, Inc. v. CCBill LLC* ...........................................................................12
488 F.3d 1102 (9th Cir. 2007)

*Perfect 10, Inc. v. Cybernet Ventures, Inc.* ...........................................11, 20, 22
213 F. Supp. 2d 1146, 1175 (C.D. Cal. 2002)

*Rosen v. eBay, Inc.* .....................................................................................13, 20
2015 WL 1600081 (C.D. Cal. 2015)

*Scott v. Harris* ...............................................................................................9
550 U.S. 372, 378 (2007)

*UMG Recordings, Inc. v. Shelter Capital Partners LLC* ......................................10
718 F.3d 1006, 1014 (9th Cir. 2013)

*UMG Recordings, Inc. v. Veoh Networks Inc.* ...................................................13
665 F. Supp. 2d 1099 (C.D. Cal. 2009)

*United States v. Hughes Aircraft Co.* ......................................................................9
No. CV 89-6842-WJR(SX), 1991 U.S. Dist. LEXIS 20548
1991 WL 11693422, at *2 (C.D. Cal. 1991)

*Viacom Intern., Inc. v. YouTube, Inc.* ................................................................13
676 F.3d 19 (2d Cir. 2012)

*Wolk v. Kodak Imaging Network, Inc.* ...........................................................3,14
840 F. Supp. 2d 724 (S.D.N.Y. 2012)

**Statutes**

17 U.S.C.§ 501 ...................................................................................................5

**Other Authorities**

S.Rep. No. 105– 190, at 8 (1998)    ...................................................................10

**Rules**

Fed. R. Civ. P. 56(c)    .........................................................................................8

Fed. R. Civ. P. 56(c)(2)    .....................................................................................9

## I. **INTRODUCTION**

Before the Court in this copyright infringement case is plaintiff Greg Young Publishing, Inc.'s ("GYP" or "Plaintiff") Motion for Partial Summary Judgment (this "Motion").  In this Motion, GYP requests that the Court grant summary judgment in its favor by ruling that Defendant Zazzle Inc. ("Defendant" or "Zazzle") is not entitled to the affirmative defense that its infringing conduct falls within the safe harbor set forth in 17 U.S.C. § 512(c) of the Digital Millennium Copyright Act (the "DMCA"), which protects qualifying internet service providers ("ISPs") from certain copyright infringement liability under certain circumstances. Specifically, the Court should find that the safe harbor does not apply to Zazzle because it does not qualify as a service provider as contemplated under the DMCA, or alternatively that Zazzle does not satisfy certain other requirements of the DMCA in order to be eligible for the safe harbor protection.

## II. **BACKGROUND**

### A. Plaintiff

GYP is a small art publisher and licensor located in Santa Barbara, California, that licenses images which it either owns (in the case of the Kerne Erickson) and or represents as a licensing agent (in the case of Scott Westmoreland and other artists) for use on various products, including many of the same products that are manufactured and sold by Zazzle.  Zazzle, however, is not an authorized licensee of GYP (nor are the individual affiliate members of Zazzle known as "Designers" or "Users" who provide images to Zazzle).  GYP's business is predicated on earning royalties from the sales of various products that are sold by authorized licensees of GYP images.

GYP does not earn royalties from the sale of Zazzle manufactured products that contain GYP's images, nor has Zazzle ever provided GYP any of the

revenue that Zazzle has earned from such products.  Consequently, Zazzle has received a financial benefit directly attributable to its use of GYP's images, while GYP has been denied royalties from both Zazzle and from the potential sales that GYP's actual authorized licensees may have made had a customer not purchased an unauthorized product from Zazzle instead.

## B. **Defendant**

Launched in 2005 and based in Redwood City, California, Zazzle is the world's leading platform for quality custom products.  (Answer ¶¶ 2,18). Zazzle's proprietary technology enables individuals, professional artists and major brands, including Disney and Warner Bros, to create and offer billions of unique products for customers worldwide.  (Answer ¶18).  Creations from 600,000+ Designers and hundreds of major brands are available on hundreds of product lines, with near infinite variations.  (Answer ¶18).  Zazzle has "a large number of Designers (over 600,000) who have set up accounts to upload their designs to Zazzle.com and receive royalties for products that are sold containing reproductions of their designs."  (Answer ¶ 20).

The first affirmative defense in Zazzle's Answer states that "GYP's claims are barred in whole or in part by the DMCA safe harbors in 17 U.S.C. § 512." (Answer ¶ 87).   Zazzle contends that "it is a 'service provider' under the DMCA that merely operates the Zazzle platform to which users can upload designs at their direction for printing at the direction of these users on products supplied by Zazzle." (Answer ¶ 18).  Zazzle's support for its defense only tells part of the story, however.  In fact, "Zazzle manages all material aspects of the transactions conducted on its website, including internet hosting, marketing, search engine optimization, production of merchandise, shipping, invoicing, billing, product return, and refunds."  (Answer ¶ 25).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## C. Defendant's Business Operations

Customers of Zazzle can order products from Zazzle by either uploading their own design as a one-off upload or by choosing an existing design that is already available for selection from Zazzle's "Marketplace."    Although GYP suspects that Zazzle has created many derivative products using GYP's images where the image was provided to Zazzle via one-off uploads, it is practically impossible for GYP to prove this without performing discovery on the presumably hundreds of thousands of images that have been uploaded by Zazzle's customers.  Because Zazzle is relying on the DMCA safe harbor and the copyright owner to notice it of infringements, it has not policed for any of GYP's images being uploaded as one-off product orders.  Consequently, the accountings provided by Zazzle for products made with GYP's images only demonstrate a portion of the damages because they do not include these one-off products.

However, Zazzle's business model does not merely operate by making products from the one-off upload of images by individual customers.  On the contrary, Zazzle has become the "world's leading platform for quality custom products" by amassing a very large collection of ready-to-select images from over 600,000 Designers (the "Designers" or "Users") who have uploaded images they have presumably created or found onto Zazzle's online platform.  Zazzle itself, and not the Designer, "sets a base price for each product sold on the Zazzle service, and [the] Designers are able to choose a royalty rate between 5% and 99% for any product that is sold on Zazzle with the Designer's design to be added on top of the base price." (Answer ¶ 21).  Unlike a large subset of ISPs that provide platforms for the purpose of allowing users to store their photographs in digital albums for sharing with family and friends, (for example, Photobucket.com, see *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012)), Zazzle's platform exists solely to host a large number of

images from which customers can choose to apply on-demand custom manufactured products.  As such, Zazzle's service is to provide an online platform that allows commercial customers to shop for products and to select images to decorate those products that are ultimately sold, manufactured and distributed by Zazzle.

It is in connection with Zazzle's Marketplace platform of stored and displayed images that GYP discovered the infringements that form the basis of its copyright infringement claims.  Over the past several years, Plaintiff has found a large number of US Copyright registered images that it either owns or of which it is the exclusive licensing agent (the "GYP Images").  Since discovering the Zazzle website in 2013, GYP has been finding GYP Images on the website and has had to continue monitoring Zazzle's Marketplace to periodically issue DMCA takedown notices.  This exercise has been not unlike a game of copyright enforcement "whack-a-mole" where GYP gets Zazzle to remove identified images only to later find that others have popped up in their place.  To date, forty-one (41) different GYP Images have been discovered on the Zazzle Marketplace, some having been used on multiple occasions, all uploaded and used without authorization from GYP.  Of the forty-one GYP Images discovered, thirty-seven (37) were actually used by Zazzle to make at least 4,629 products. See J. Young Decl. ¶ 8, Ex. "F."

Frustrated by this back and forth, GYP's counsel finally had a conversation with a Zazzle manager, Tony Ly, and sent Mr. Ly a copy of GYP's catalog of images by the artist Kerne Erickson on October 3, 2013.  See J. Young Decl. ¶ 6, Ex. "D."   GYP's understanding and hope was that this catalog would assist Zazzle in better monitoring its website for unauthorized use of GYP's Kerne Erickson images.  Unfortunately, GYP's hopes were in vain because by July of 2015, GYP noticed Zazzle about forty-six (46) new instances where GYP's Kerne Erickson images had been uploaded by Designers and were being

1  publicly displayed and offered for sale in connection with products sold by
2  Zazzle.   See J. Young Decl. ¶ 7, Ex. "E."  It was only after becoming frustrated
3  further from additional years of carrying out the time consuming and costly
4  process of having to police and notify Zazzle that GYP decided to bring its
5  current lawsuit against Zazzle.  To punctuate the problem, since filing its original
6  complaint with the court, GYP has continued to find GYP Images on the Zazzle
7  platform.  Plaintiff's filing of its Supplemental Complaint is due in part to this
8  ongoing problem.

9      To be clear, GYP's complaint is not rooted in the fact that Zazzle has created
10  a "platform to which users can upload designs at their direction."  (Answer ¶ 18).
11  If this were the only infringing activity for which Zazzle were responsible, then
12  this matter would most likely not be before this Court.  The real issue at hand is
13  that Zazzle itself, and not its Designers, has physically reproduced the GYP
14  Images no less than 4,629 times and created derivative products that it has then
15  packaged, shipped and sold all in direct violation of GYP's copyrights under the
16  United States Copyright Act, 17 U.S.C.§ 501.  See J. Young Decl. ¶ 8, Ex. "F."

17      Zazzle's violation of GYP's copyrights were not accomplished by a passive
18  automated online system transmitting intangible ones and zeros over the
19  Internet.  On the contrary, as the evidence demonstrates, Zazzle's
20  manufacturing, sales and shipping procedures are heavily manned and
21  monitored – not unlike a typical real world brick-and-mortar vendor.  In fact,
22  Zazzle operates out of two very large warehouse facilities in San Jose, California
23  where it makes tangible products.

24      So, although Zazzle uses an online website to facilitate the ordering and
25  sales process, the vast majority of Zazzle's activities occur offline in the physical
26  world.  After a customer chooses an uploaded image to be printed on blank
27  merchandise and thereafter places an order, Zazzle's team of content reviewers

28

goes to work.  Thirty (30) to fifty (50) reviewers, members of Zazzle's Validation Department, look at approximately 20,000 images each day, for design and content issues (flaws).  See J. Young Decl. ¶ 3, Ex. "A" – Ly depo 9:2-10:12, 14:6-25.  Considerable staff decision making is involved in the review process.  See J. Young Decl. ¶ 3, Ex. "A" – Ly depo 18:8-21:1, ¶ 9, Ex. "7" – Zazzle Video – Posters.  Once the content reviewer makes a decision that the image is approved for use, it is sent to one of between 100 and 150 printing machines residing in two buildings totaling 150,000 square feet in size.  See J. Young Decl. ¶ 4, Ex. "B" – Agnich depo 9:18-10:4, 12:6-20.  Upon being sent to print, Zazzle employees in the receiving inventory group go to work pulling the raw materials needed for the particular order.  This team receives the blank materials at the manufacturing facility, pulls the inventory required for an order, and delivers it to the appropriate printing machine or manufacturing area.  See J. Young Decl. ¶ 4, Ex. "B" – Agnich depo11:3-12:2, 26:24-27:2.

Once an image arrives at a chosen printing machine, a Zazzle employee operates the machine to insure the correct blank merchandise is about to be printed on.  There are between 30 and 40 employees that operate the printing machines between each of Zazzle's two facilities.  For an invitation order, for example, the operator needs to direct the type of paper to be printed on before instructing the press to print it.  The operators also unload the printed product, stack it so that it can be sent to the finishing floor on a rack.

A Zazzle employee then rolls the printed products to the finishing floor. See J. Young Decl. ¶ 4, Ex. "B" – Agnich depo 19:5-20:15, 25:8-27:24.  On the Finishing Floor up to 40 people apply finishing touches to the products, such as cutting, binding and applying protective coatings.  According to Jonathan Agnich, this is the most labor intensive part of the manufacturing process. See J. Young Decl. ¶ 4, Ex. "B" – Agnich depo 27:13-29:9, 28:23-29:4.  Once the products are finished, a dedicated team of quality control members checks to insure the

proper image that was chosen by the customer was printed on the blank product and for other printing defects. See J. Young Decl. ¶ 4, Ex. "B" – Agnich depo 33:19-35:1.

From the Finishing Floor, products are sent to Packaging, where up to 15 people are involved in selecting the correct packaging container and packaging the product. As part of this process an employee scans a barcode and prints and applies a shipping label to the package. Thereafter, the package is sent on a conveyor to the receiving/shipping area. See J. Young Decl. ¶ 4, Ex. "B" – Agnich depo 29:10-25, 30:1-4. At the receiving/shipping areas dedicated Zazzle employees are also involved getting packages ready for delivery to the transportation carriers; as few as three at one of the facilities and between 12 to 15 at the other facility. See J. Young Decl. ¶ 4, Ex. "B" – Agnich depo 30:11-32:20. Lastly, it any products are returned or customer support needed, Zazzle employees are involved in handling any such returns or customer inquiries. See J. Young Decl. ¶ 4, Ex. "B" – Agnich depo 35:8-37:9.

Each of the real world products that Zazzle manufactures and sells are categorized by product type into departments, although many departments operate out of the same warehouse. Zazzle provides separate "About Us" profiles for the different departments on its website to promote their unique qualities. Each "About Us" page proudly declares that Zazzle's products are produced in Zazzle's very own state-of-the-art manufacturing facilities in San Jose, California. See J. Young Decl. ¶ 10, Ex. "H ". For the "About Us" pages Zazzle has created videos depicting nearly all of the printing/manufacturing process described above. See Exhibits. 1 to 7 on the CD manually filed with the court.

Taken as a whole, the various videos on Zazzle's website do a thorough job of documenting how Zazzle's business model works and, more importantly, how Zazzle employees play an active role in the product manufacturing and

distribution process.  Video Ex. 1 shows at least one of Zazzle's massive warehouses that it uses to store its various products, as well as house its manufacturing, packaging and shipping operations.  In Video Ex. 1, Bobby Beaver (Co-Founder/CTO) exclaims "We think we have a fantastic product," while Charles Ohiaeri (Vice President, Operations) states "Here at Zazzle, we digitally print on all of the products that we offer."  All seven videos thoroughly show and discuss how the manufactured products and the images that are applied to them are inspected multiple times through the manufacturing process; manipulated in various ways such as editing on computers, printing, cutting, pressing, finishing, binding and stacking; and then packaged and labeled for shipping. See Video Exs. 1-7).  The "Designers" or "Users" who uploaded the images play absolutely no role in the manufacturing, inspection, packaging, shipping and refunding of the products that Zazzle sells.

## III.  <u>LEGAL STANDARD</u>

### A. Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir. 1985).  A disputed fact is material where its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. Id. The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving

party may satisfy that burden by showing "that there is an absence of evidence to support the non-moving party's case." Id. at 325.

Once the moving party has met its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must go beyond the pleadings and identify specific facts that show a genuine issue for trial. Id. at 587. Only genuine disputes over facts that might affect the outcome of the lawsuit will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248; see also *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir. 2001) (holding that the non-moving party must present specific evidence from which a reasonable jury could return a verdict in its favor). A genuine issue of material fact must be more than a scintilla of evidence, or evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer,* 198 F.3d 1130, 1134 (9th Cir. 2000).

A court may consider the pleadings, discovery, and disclosure materials, as well as any affidavits on file. Fed. R. Civ. P. 56(c)(2). Where the moving party's version of events differs from the non-moving party's version, a court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

"[S]ummary judgment is an available procedure for attacking legally insufficient affirmative defenses." *United States v. Hughes Aircraft Co.*, No. CV 89-6842-WJR(SX), 1991 U.S. Dist. LEXIS 20548, 1991 WL 11693422, at *2 (C.D. Cal. 1991). "An affirmative defense, under the meaning of Federal Rule of Civil Procedure 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven." *Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1173 (N.D. Cal. 2010). "It is a defense on which

1  the defendant has the burden of proof." Id. at 1174.  "Because the DMCA safe

2  harbors are affirmative defenses, [the Defendant] has the burden of establishing

3  that he meets the statutory requirements." See *Columbia Pictures Industries, Inc.*

4  *v. Fung*, 710 F.3d 1020 (9th Cir. 2013), citing  *Balvage v. Ryderwood*

5  *Improvement and Serv. Ass'n, Inc.,* 642 F.3d 765, 776 (9th Cir. 2011).

6  **B. The Digital Millennium Copyright Act (DMCA)**

7      "Difficult and controversial questions of copyright liability in the online world

8  prompted Congress to enact [the DMCA]." *UMG Recordings, Inc. v. Shelter*

9  *Capital Partners LLC,* 718 F.3d 1006, 1014 (9th Cir. 2013) (*quoting Ellison v.*

10  *Robertson,* 357 F.3d 1072, 1076 (9th Cir. 2004)). Congress needed to balance

11  the interests of copyright holders with those of internet service providers whose

12  services may be used by others to infringe copyrights.  *Corbis Corp. v.*

13  *Amazon.com*, LLC, 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004), overruled

14  on other grounds, *Cosmetic Ideas, Inc. v. IAC/Interactivecorp*., 606 F.3d 612 (9th

15  Cir. 2010).   In balancing these interests, Congress was particularly "loath to

16  permit the specter of liability to chill innovation" on the web. *UMG Recordings*,

17  718 F.3d at 1014. Congress decided that "by limiting [service providers'] liability,"

18  it would "ensure[ ]   that the efficiency of the Internet will continue to improve and

19  that the variety and quality of services on the Internet will continue to expand." Id.

20  (quoting S.Rep. No. 105 –190, at 8 (1998)). To that end, DMCA created several

21  "safe harbors" that protect certain common activities of internet service

22  providers. *Corbis*, 351 F. Supp. 2d at 1098 (citing S.Rep. No. 105-190, at 19).

23  These safe harbors do not render service providers immune from copyright

24  infringement, but they do protect eligible service providers from all monetary and

25  most equitable relief that may arise from such activity. Id. at 1098-99 (citing

26  *Ellison*, 357 F.3d at 1077).

27      There are a series of threshold criteria that a service provider must meet in

28  order to be eligible for the safe harbors. At the outset, the party must actually

qualify as being a "service provider." *Corbis*, 351 F. Supp. 2d at 1099 (citing 17 U.S.C. § 512(k)(1)(B)).  If the party fits the definition of "service provider", it must then demonstrate that it meets certain conditions of eligibility, namely that (i) it has adopted, reasonably implemented, and informed its users of "a policy that provides for the termination in appropriate circumstances" of repeat infringers (17 U.S.C. § 512(i)(A)); and (ii) it accommodates "standard technical measures" used by copyright owners to identify or protect copyrighted works. (17 U.S.C. § 512(i)(B)).  "A service provider that does not meet these threshold conditions may not invoke the DMCA's safe harbor limitations on liability." *Corbis*, 351 F. Supp. 2d at 1099 (citing *Ellison*, 357 F.3d at 1080).[1]

Only if the threshold criteria are satisfied, may the service provider avail itself of one or more of the safe harbor protections offered by the DMCA.  While Zazzle does not expressly state which of the four safe harbors it is seeking, the context of its affirmative defense strongly suggests it is asserting the third safe harbor—protection for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c).  To qualify for this particular safe harbor, a defendant must demonstrate pursuant to 17 U.S.C. § 512(c)(1) that, among other things[2], it:

> (A) did not have actual knowledge that the material or an activity using the material on the system or network was infringing; or in the absence of such actual knowledge, it was not aware of facts or circumstances from which infringing activity was apparent; or upon

[1] Plaintiff does not believe that sufficient evidence exists on the record as of yet regarding Zazzle's satisfaction of the requirements of a repeat infringer policy and accommodations of standard technical measures, and therefore Plaintiff will concede, for purposes of this Motion only, that Zazzle has satisfied these requirements.

[2] Plaintiff does not challenge, and therefore will not discuss, the third condition regarding expeditious removal under 17 U.S.C. § 512 (c)(1)(C).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

obtaining such knowledge or awareness, acted expeditiously to remove, or disable access to, the material; and

(B) did not receive a financial benefit directly attributable to the infringing activity, in a case in which it had the right and ability to control such activity.

## IV. DMCA SAFE HARBOR DOES NOT APPLY TO ZAZZLE

GYP now moves for partial summary judgement against Zazzle's DMCA safe harbor defense based on the arguments provided herein that: a) Zazzle does not qualify as a "service provider" under the definition of Section 512(k)(1); and b) if Zazzle somehow satisfies the foregoing, then it does not qualify for the safe harbor because the factual evidence demonstrates that (i) Zazzle had knowledge or awareness of the infringing activity, and (ii) Zazzle received a financial benefit in a case in which it had the ability to control such the infringing activity.

## A. Zazzle is not a 'Service Provider'

For purposes of the §512(c) safe harbor, the term 'service provider' carries the broad definition of "a provider of online services or network access, or the operator of facilities therefor." *In re Aimster Copyright Lit.*, 252 F. Supp. 2d 634, 658 (N.D. Ill. 2002). It is well accepted that the definition of service provider under the DMCA is interpreted broadly. *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1175 (C.D. Cal. 2002). Notwithstanding this general acceptance, "Congress must have intended this threshold inquiry to impose some limitation on the availability of the § 512 safe harbors, or it would not have included the "service provider" requirement at all." *Agence France Presse v. Morel,* 934 F. Supp. 2d 547, 565 (2013).

In *Morel*, the Court ultimately found that while the defendant operated its database of images as an online service, the fact that it was directly licensing copyrighted material through that online service caused it not to be a "service

1
2
provider.  *Morel*, 934 F. Supp. 2d at 566.  To support its decision, the Court declared that the DMCA safe harbors are:

3
4
5
6
7
8
9
> "generally directed toward protecting entities that 'do something useful' for others with respect to providing or facilitating access to materials online or the activities of internet users, such as providing search engines or connectivity to a website. In contrast, licensing copyrighted material online more closely resembles the mere sale of goods (albeit, in this case, intellectual property) than facilitating users' activities online."  *Morel* at 566.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
*Morel* stands out as a notable exception to most DMCA cases that usually either presume the defendant has satisfied the definition of service provider without any examination or finds that it satisfies the definition based on the fact that the defendant did not play an active role in the infringement.  See, e.g., *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007) (no apparent dispute that one company who provided webhosting and related Internet connectivity services to the owners of various websites and another who allowed consumers to use credit cards or checks to pay for subscriptions or memberships to e-commerce venues were "service providers");  *In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003) (no apparent dispute that online service that facilitated music swapping between users was a "service provider"); *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099 (C.D. Cal. 2009) (no apparent dispute that company who facilitated users to share videos with anyone who has an internet connection was a "service provider"); *Viacom Intern., Inc. v. YouTube, Inc*., 676 F.3d 19 (2d Cir. 2012) (no apparent dispute that company who facilitated users to share videos with anyone who has an internet connection was a "service provider");  *Rosen v. eBay, Inc.,* 2015 WL 1600081 (C.D. Cal. 2015) (no apparent dispute that an online marketplace that facilitates third parties to buy and sell items from each other

was a "service provider");  *Hendrickson v. Amazon.com*, Inc., 298 F. Supp. 2d 914, 915 (C.D. Cal. 2003) (ruling that Amazon was a "service provider" in the context of the case specifically because it was not directly selling the infringing items at issue); *Wolk v. Kodak Imaging Network, Inc*., 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2012) (ruling that website that hosts and facilitates online sharing of photos and videos at the direction of users qualifies as a "service provider").

The ISPs in the cases cited above all played a passive and/or automatic role in the infringements at issue, and this factor appears to be critical for an ISP to qualify as a "service provider" under the DMCA (hereinafter referred to as a "Qualified Service Provider").  In fact, the protection of ISPs who only play a passive and automatic role the inherent purpose of the DMCA.  "The DMCA was enacted [] to provide immunity to service providers from copyright infringement liability" for "passive," "automatic" actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider. H.R. Conf. Rep. No. 105–796, at 72 (1998), reprinted in 1998 U.S.C.C.A.N. 649; H.R.Rep. No. 105–551(I), at 11 (1998)." *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (quoted by *Perfect 10, Inc. v. CCBill LLC*, 340 F. Supp. 2d 1077, 1086 (C.D. Cal. 2004))

By directly manufacturing and selling physical products through the use of numerous employees and manual processes, Zazzle goes well beyond passive and automatic acts.  Thankfully, a California court has already examined similar facts and ruled that "an online service that directly sells, rather than facilitates the sale of, products likely falls outside the definition of a "service provider."" *Gardner v. CafePress Inc*., 2014 WL 794216 (S.D. Cal. 2014).  *Gardner* is even more notable because the defendant in the case, CaféPress, is a direct competitor of Zazzle, with a near identical business model.  In *Gardner*, CaféPress was the party bringing the motion for summary judgement based on

its 17 U.S.C. § 512(c) safe harbor affirmative defense.  Judge Curiel denied CafePress's motion by declaring he could not rule that CaféPress is a "service provider" because it "goes beyond facilitating the sale of products between internet users by directly selling products to online shoppers…" Id. at *5.  Judge Curiel also noted that "CafePress's policy of determining retail prices for products sold through the Marketplace and paying users only a royalty or commission for the sale of their products highlights the fact that CaféPress has gone beyond operating a service that merely facilitates the exchange of information between internet users." Id.   Because Zazzle determines the retail prices for the products that are sold through its Marketplace and pays its users only a royalty or commission for the sale of the Zazzle products just like CaféPress, a similar decision should be made here that Zazzle is not a Qualified Service Provider.

Zazzle, however, purports to be a Qualified Service Provider much like YouTube, Veoh or Photobucket because it allegedly "merely operates the Zazzle platform to which users can upload designs at their direction for printing at the direction of these users on products supplied by Zazzle." (Answer ¶ 18).  The facts clearly demonstrate that Zazzle's Answer does not do justice to the level of involvement that Zazzle plays beyond its operation of the Zazzle platform.  The Zazzle platform is a significant part of the Zazzle business model primarily because that is how Zazzle attracts Designers to upload images such as the GYP Images, which images in turn attract customers to buy Zazzle products. One can presume that the more images from which customers can choose, the more products Zazzle will be able to sell.

Perhaps Zazzle may also attempt to liken its Marketplace to an ISP like eBay that facilitates the sale of products between buyers and sellers.  After all, Zazzle Designers are able to set up storefronts on the Zazzle website and sell products. But unlike eBay, which is filled with items that are owned, held, priced, sold,

packaged and shipped by the individual eBay sellers, the Zazzle Designer storefronts are all peddling the same products that are owned, held, priced, sold, packaged and shipped not by the Designer but by Zazzle itself.  And just as Amazon.com, Inc. was found to be a Qualified Service Provider in *Hendrickson* specifically because a third party and not Amazon itself was the actual seller of the infringing product, conversely, Zazzle should be found not to be a Qualified Service Provider because it is the actual seller of the infringing products in this case.  *See* 298 F. Supp. 2d at 915.

Also unlike a Qualified Service Provider such as eBay, Zazzle is not just passively offering customers an automated system to store images or facilitate third party transactions.  In fact, the worst infringements of GYP's copyrights in this case are not those digital reproductions or public displays that could be labeled as having occurred "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by" Zazzle.  *See* 17 U.S.C. § 512(c).[3]   No, the worst infringements are those where Zazzle itself has reproduced copies of the GYP Images through its printing machines and manually applied them to various products, and thus produced derivative works, which it in turn packaged and physically shipped for profit.  *See* 17 U.S.C. § 512(c).  Consequently, Zazzle does not limit its infringing activities to the digital world of the Internet like a Qualified Service Provider, but goes a step further and brings its infringing activities into the physical tangible world.  There is no support for the proposition that DMCA protection was meant to be extended beyond the Internet.

---

[3] It is important to note that the mere fact that a service provider qualifies for DMCA protection does not mean that the service provider cannot be deemed to have committed an infringement, but rather it is immune from certain liabilities associated with the copyright infringement that was committed. See Corbis, 351 F.Supp.2d at 1098-1099.  It is also noteworthy that in every DMCA case cited herein where the court found safe harbor protection, the form of infringement - either reproduction, public display, distribution or public performance - occurred digitally or electronically.

Zazzle has managed to operate for years pretending to qualify as a protected service provider under the DMCA because it operates a website.  Zazzle will no doubt respond to this Motion and try to convince this Court that its website and upload platform feature makes Zazzle a Qualified Service Provider.  Plaintiff urges the Court to see through any attempt by Zazzle to cover its infringing activities in sheeps' clothing.  Zazzle claiming it is a DMCA qualified service provider because of one part of its business is akin to a clothing manufacturer attempting to pass off a "Made in the USA" label because it manufactures jeans in the USA while using foreign made fabric, buttons, zippers, and thread.  See *Clark v. Citizens of Humanity, LLC*, F. Supp. 3d 1199 (S.D. Cal. 2015).  In other words, just because one element may qualify does not negate the fact that the other elements do not.

In fact, Plaintiff contends that the infringing acts of digital reproduction and public display that occur via Zazzle's platform should not be parsed from its other infringing activities.  Because Zazzle does not qualify as a service provider, no activities that it carries out should be considered as protected under a DMCA safe harbor.  Accordingly, while the online platform by itself and absent Zazzle's other activities might be protected by a DMCA safe harbor if it were operated by a Qualified Service Provider, the fact that Zazzle is not a Qualified Service Provider should bar it from receiving a safe harbor for any of its infringing activities that are part of the same business process.

In conclusion, Zazzle cannot and should not be defined as a "service provider," because the evidence presented is indisputable that Zazzle's role in the infringement of the GYP Images goes far beyond passive automation in which its system engages through a technological process initiated by another. Because Zazzle cannot be defined as a "service provider" in connection with the primary function of its business, it should not receive the benefit of that definition for any of its infringing activities, including its infringing digital reproduction and

1   public display of images on the Internet, regardless of whether they were
2   uploaded by third party users.  However, even if this Court somehow concludes
3   that Zazzle's online platform makes it a "service provider" in connection with its
4   online activities, the Court should find that Zazzle does not get to carry that
5   important distinction into the physical world where it carries out the bulk of its
6   infringing activities, specifically, the infringing printing of the GYP Images, the
7   preparation of derivative products from the GYP Images and the distribution of
8   the GYP Images on commercial products.

9

10  **B. Zazzle Does Not Qualify for the Safe Harbors as Required by 17 U.S.C. §**
11  **512(c)(1)**

12      Should the Court rule that the factual record is insufficient to make a
13  determination on the "service provider" issue, it should still find for and grant
14  Plaintiff's Motion based on the fact that the facts demonstrate that Zazzle does
15  not qualify for the relevant safe harbor as required under 17 U.S.C. § 512(c)(1).
16  To qualify for the 17 U.S.C. § 512(c) safe harbor, Zazzle must demonstrate
17  pursuant to 17 U.S.C. § 512(c)(1) that, among other things, it:

18      (A) did not have actual knowledge that the material or an activity
19      using the material on the system or network was infringing, see 17
20      U.S.C. § 512(c)(1)(A)(i); or in the absence of such actual knowledge,
21      it was not aware of facts or circumstances from which infringing
22      activity was apparent, see 17 U.S.C. § 512(c)(1)(A)(ii); and

23      (B) did not receive a financial benefit directly attributable to the
24      infringing activity, in a case in which it had the right and ability to
25      control such activity, see 17 U.S.C. § 512(c)(1)(B).
26
27
28

**1. Zazzle did have actual knowledge that copies of the GYP Images or its activity using the GYP Images on the Zazzle system or network was infringing.**

First, Plaintiff would like to note that the requirements of 17 U.S.C. § 512(c)(1)(A), specifically, the reference to "on the system or network" only further supports Plaintiff's position that the DMCA is not meant to cover infringing activities that are occurring as the result of employees manually producing infringing products in a San Jose warehouse.

Nonetheless, the factual record shows that Zazzle had been informed by Plaintiff on multiple occasions that Zazzle Designers were uploading unauthorized reproductions of the GYP Images onto Zazzle's online platform. Zazzle also knew from its own records that it was actually taking orders and manufacturing products from the GYP Images.  Moreover, Zazzle accepted copies of GYP's catalog of Kerne Erickson images, which represents 35 of the GYP Images at issue in this case, and had purportedly used those images, on at least one occasion, in an effort to remove any Kerne Erickson images it could find on the Zazzle's Marketplace.  See J. Young Decl. ¶ 6, Ex. "D."

It can therefore be concluded that Zazzle had actual knowledge that GYP Images were being uploaded on at least a periodic basis to Zazzle's online platform and that Zazzle employees were in turn manufacturing products from such GYP Images, and all without any authorization from GYP.  Because Zazzle had possession of and access to the Kerne Erickson catalog of images, it also would have had actual knowledge of the majority of GYP Images at issue in this case.  Therefore each time Zazzle manufactured products using images created by the artist Kerne Erickson, it would have known that it did not have authorization from GYP to manufacture those products.

If the Court finds that Zazzle's level of knowledge of the GYP Images along with the multiple notices of infringement do not impute actual knowledge upon it

1  such that Zazzle fails the requirement of 17 U.S.C. § 512(c)(1)(A)(i), then

2  alternatively the Court should find that at the very least Zazzle was aware of

3  facts or circumstances from which infringing activity was apparent, by way of the

4  same facts, and thus fails to satisfy 17 U.S.C. § 512(c)(1)(A)(ii).

**2. Zazzle received a financial benefit directly attributable to its infringing activity, in a case in which it had the right and ability to control such activity.**

A Qualified Service Provider will be excluded from the § 512(c) safe harbor if it (1) has the "right and ability to control" the infringing activity, and (2) receives "a financial benefit directly attributable to the infringing activity." 17 U.S.C. § 512(c)(1)(B).  "Both elements must be established for safe harbor coverage to be denied."  *Rosen v. eBay, Inc.*, 2015 WL 1600081, *12 (C.D. Cal. 2015) (quoting *Corbis*, 351 F. Supp. 2d at 1109; 3 Nimmer on Copyright, § 12, 12B.04).  Zazzle had the right and ability to control the infringing activity at issue in this case and received a financial benefit directly attributable to such activity.  See J. Young Decl. ¶ 17, Exhibit "N,"  ¶ 9,  Exhibit "G" and E. Seay Decl. ¶ 2, Exhibit "A."

**a. Zazzle received a financial benefit from the infringing activity**

Plaintiff will first examine Zazzle's financial benefit.  The Ninth Circuit has suggested that, where a service provider charges users for its services, a directly attributable financial benefit exists "where there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1044 (9th Cir. 2013). In the *Cybernet* case, the court found a direct relationship to the infringing activity where the defendant received a direct flow of income in connection with

the infringing activity.  213 F. Supp. 2d at 1181 (stating in support of its conclusion that "[t]he more new visitors an infringing site attracts, the more money Cybernet makes.")  In *Hendrickson*, the court found that Amazon.com, Inc. received a financial benefit where a third party seller sold infringing materials through the Amazon marketplace and Amazon received a share of the sales.  298 F. Supp. 2d at 918.

Here, it is indisputable that Zazzle received a financial benefit from its infringing reproduction of the GYP Images onto derivative products.  Each time a customer chose a GYP Image from the Zazzle Marketplace and purchased a Zazzle product on which it would be printed, Zazzle received a direct financial benefit as soon as it accepted payment for that product.  It is undeniable that Zazzle made money selling posters, postcards, mousepads and other items bearing unauthorized reproductions of the GYP Images.

**b. Zazzle had the right and ability to control the infringing activity**

When a party is found to have received a financial benefit from its infringing activity, "its only defense is to prove that it does not have the right and ability to control such activity."  *Hendrickson*, 298 F. Supp. 2d at 918.  In *Hendrickson* the court ultimately found that while Amazon did receive a financial benefit it did not have control over the infringing activity because it merely provided the forum for an independent third party seller to list and sell. See Id.  However, the court suggested that its ruling would have been different had Amazon been in actual possession of the infringing product and had the opportunity to inspect the item. See Id.  It is not difficult to draw a converse conclusion in connection with the facts for this Motion where it has been shown that Zazzle does have actual possession of the infringing products and does inspect those products.

Other courts have suggested that control may exist where the service provider is "actively involved in the listing, bidding, sale and delivery" of items offered for sale, See *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001), or where it otherwise controls vendor sales by previewing products prior to their listing, editing product descriptions, or suggesting prices, See *Corbis Corp.*, 351 F. Supp. 2d at 1110.  Again, Zazzle can be found to have control under this guidance because it is actively involved in selecting the products that are sold, pricing those products, selling the products, manufacturing the products, inspecting the products and finally packaging and delivering the products.  Judge Baird stated that to demonstrate control there must be "something more" than the mere ability to exclude users from the ISP's system.  *Cybernet Ventures, Inc.*, 213 F. Supp. 2d at 1181.  Zazzle's direct involvement in the infringing activity and therefore its right and ability to control that activity certainly satisfies Judge Baird's search for "something more."

Given that Zazzle has been shown to have the "right and ability to control" the infringing activity, and that it receives "a financial benefit directly attributable to the infringing activity" the Court should find that Zazzle cannot satisfy the requirements of 17 U.S.C. § 512(c)(1)(B).  Consequently, even if Zazzle were to meet the definition of a "service provider," it cannot receive protection under the 17 U.S.C. § 512(c) safe harbor because it does not meet the eligibility requirements.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court should rule in GYP's favor by finding that Zazzle is not entitled to the affirmative defense that its infringing conduct falls within the safe harbor set forth in 17 U.S.C. § 512(c) of the Digital Millennium Copyright Act.

Respectfully submitted,

Dated: March 27, 2017                LAW OFFICES OF JEFFREY S. YOUNG

BY: _____ */s/ Jeffrey S. Young* _____
Jeffrey S. Young, attorney for Plaintiff
Greg Young Publishing, Inc.