**JEFFREY S. YOUNG, SBN172016**
**LAW OFFICES OF JEFFREY S. YOUNG**
1307 State Street, First Floor
Santa Barbara, CA 93101
jeff@jeffreyyounglaw.com
Tel: (805) 884-0338
Fax: (805) 884-0799

Attorney for Plaintiff GREG YOUNG PUBLISHING, INC.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREG YOUNG PUBLISHING, INC., a corporation,<br><br>Plaintiff,<br><br>v.<br><br>ZAZZLE, INC., a corporation, and DOES 1 to 10,<br><br>Defendants | Case No. 2:16-cv-04587 SVW (KSx)<br><br>**GREG YOUNG PUBLISHING'S AMENDED STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: April 24, 2017<br>Time: 1:30 p.m.<br>Judge: Hon. Stephen V. Wilson<br>Depart: 10A |

Plaintiff Greg Young Publishing, Inc. ("GYP") submits this statement of undisputed facts in support of its motion for partial summary judgment.

**GYP's Business**

| | | |
|---|---|---|
| 1. | Plaintiff, GYP is a California-based art publisher. GYP represents several artists, including Kerne Erickson and Scott Westmoreland. | G. Young Decl. ¶ 2 |

1
GYP'S AMENDED STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SJ

| | | |
|---|---|---|
| 2. | GYP owns the copyrights to the Kerne Erickson artwork at issue in this case. | G. Young Decl. ¶ 3 |
| 3. | GYP is the exclusive licensing agent to Scott Westmoreland and as such has the right to enforce the copyrights at issue in this case. | G. Young Decl. ¶ 4 |
| 4. | GYP never granted Zazzle the right to use any of the artwork at issue in this case. | G. Young Decl. ¶ 5 |

**Zazzle's Business is Printing and Manufacturing**

| | | |
|---|---|---|
| 5. | Zazzle operates the website located at www.zazzle.com. | Answer ¶ 20 |
| 6. | Zazzle allows Designers/Users to upload designs to the Zazzle.com website and gives them instructions on how best to do it to enhance "image size and resolution," and "color." | J. Young Decl. ¶ 12, Exhibit "J" |
| 7. | Zazzle takes Designer/User uploaded designs and prints them onto blank products, such as clothing, posters, labels, post cards, invitations, calendars, stamps, and mouse pads. | J. Young Decl. ¶ 16, Exhibits 1 -7 (Zazzle videos) |
| 8. | Zazzle provides its Designers/Users with a design tool to enable them to upload images and see how that image will appear on a Zazzle product. | J. Young Decl. ¶ 11, Exhibit "I" |
| 8. | Zazzle carries out its printing/manufacturing process at state-of-the-art facilities located in San Jose, California. | J. Young Decl. ¶ 6, Exhibit "H" |
| 9. | Zazzle gives its Designers/Users advice on how best to merchandise their images on Zazzle products. | J. Young Decl. ¶ 13, Exhibit "K" |
| 10 | Zazzle provides its Designers/Users with Product FAQ and Support. | J. Young Decl. ¶ 14, Exhibit "L" |
| 11 | Zazzle determines what content is acceptable for designs on Zazzle products. | J. Young Decl. ¶ 15, Exhibit "M" |

GYP'S AMENDED STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SJ

**PARTIAL SUMMARY JUDGMENT ON ZAZZLE'S AFFIRMATIVE DEFENSE FOR DMCA SAFE HARBOR**

**ZAZZLE'S PRINTING/MANUFACTURING, FINISHING, QUALITY CONTROL, PACKAGING, AND SHIPPING ARE NOT PASSIVE NOR AUTOMATED PROCESSES**

| | | |
|---|---|---|
| 12. | After a customer chooses an uploaded image to be printed on blank merchandise and thereby places an order, Zazzle's team of content reviewers goes to work. Thirty (30) to fifty (50) reviewers, members of Zazzle's Validation Department, look at approximately 20,000 images each day, for design and content issues (flaws). | J. Young Decl. ¶ 2, Ex. "A" – Ly deposition 9:2-10:12, 14:6-25. |
| 13. | Considerable staff decision making is involved in the content review process. | J. Young Decl. ¶ 2, Ex. "A" – Ly deposition 18:8-21:1. Ex. "7" – Zazzle Video – Posters. |
| 14. | Once the content reviewer makes a decision that the image is approved for use, it is sent to one of between 100 and 150 printing machines residing in two buildings totally 150,000 square feet in size. | J.Young Decl. ¶ 2, Ex. "B" – Agnich deposition 9:18-10:4, 12:6-20. |
| 15. | Upon being sent to print, Zazzle employees in the receiving inventory group go to work pulling the raw materials needed for the particular order. This team receives the blank materials at the manufacturing facility, pulls the inventory required for an order, and delivers it to the proper printing machine or manufacturing area. | J. Young Decl. ¶ 2, Exhibit "B" - Agnich deposition 11:3-12:2, 26:24-27:2. |

| | | | |
|---|---|---|---|
| | 16. | Once an image arrives at a chosen printing machine, a Zazzle employee operates the machine to insure the correct blank merchandise is about to be printed on. There are between 30 and 40 employees that operate the printing machines between each of Zazzle's two facilities. For an invitation order, for example, the operator needs to direct the type of paper to be printed on before instructing the press to print it. The operators also unload the printed product, stack it so that it can be sent to the finishing floor on a rack. A Zazzle employee then rolls the printed products to the Finishing Floor. | J. Young Decl. ¶ 2, Exhibit "B" - Agnich deposition 19:5-20:15, 25:8-27:24 |
| | 17. | On the Finishing Floor up to 40 people apply finishing touches to the products such as cutting, binding and applying protective coatings. According to Jonathan Agnich, this is the most labor intensive part of the manufacturing process. | J. Young Decl. ¶ 2, Exhibit "B" – Agnich deposition 27:13-29:9, 28:23-29:4. |
| | 18. | Once the products are finished, a dedicated team of quality control members checks to insure the proper image that was chosen by the customer was printed on the blank product and for other printing defects. | J. Young Decl. ¶ 2, Exhibit "B" – Agnich deposition 33:19-35:1. |
| | 19. | From the Finishing Floor, products are sent to Packaging, where up to 15 people are involved in selecting the correct packaging container and packaging the product. As part of this process an employee scans a barcode and prints and applies a shipping label to the package. Thereafter, the package is sent on a conveyor to the receiving/shipping area. | J. Young Decl. ¶ 2, Exhibit "B" - Agnich deposition 29:10-25, 30:1-4. |
| | 20. | At the receiving/shipping areas dedicated Zazzle employees are also involved getting packages ready for delivery to the transportation carriers; as few as three at the 2530 facility and between 12 to 15 at the 1185 facility. | J. Young Decl. ¶2, Exhibit "B" – Agnich deposition 30:11-32:20. |
| | 21. | Zazzle employees are involved in handling returns and customer service. | J. Young Decl. ¶ 2, Exhibit "B" – Agnich deposition 35:8-37:9. |

| | | |
|---|---|---|
| 22. | Zazzle has created a number of videos that accurately show and discuss its printing/manufacturing process; content review, printing, finishing, quality control, packaging and shipping. | J. Young Decl. ¶ 16, Exhibit "C", Exhibits 1 - 7, – Clark deposition 8 :14-12 :16. |
| 23. | Zazzle used at least 33 Kerne Erickson images and 4 Scott Westmoreland images to print onto products it sold to customers. Kerne Erickson images were used 4,332 times to print onto Zazzle blank products. Scott Westmoreland images were used 297 times to print onto blank Zazzle products. | J. Young Decl. ¶ 8, Exhibit "F" |
| 24. | Zazzle printed GYP's images onto; playing cards, tote bags, jigsaw puzzles, wood wall art, note books, stamps, postcards, t-shirts, luggage tags, posters, mousepads, neck ties, prints, calendars, and stickers. | J. Young Decl. ¶ 9, Exhibit "G"; E. Seay Decl. ¶ 2, Exhibit "A" |
| 25. | Zazzle has the right and ability to control all activity on their website. | J. Young Decl. ¶ 17, Exhibit "N" |
| 26. | Zazzle received money on the products it sold bearing GYP's images. | E. Seay Decl. ¶ 2, Exhibit "A", J. Young Decl. ¶ 9, Exhibit "G" |

## **CONCLUSIONS OF LAW**

1. Defendant is not entitled to the affirmative defense that its infringing conduct falls within the safe harbor set forth in 17 U.S.C. § 512(c) of the Digital Millennium Copyright Act (the "DMCA"), which protects qualifying internet service providers from certain copyright infringement liability under certain circumstances.  First, Defendant does not meet the threshold definition of being a "service provider." *Corbis Corp. v. Amazon.com, LLC*, 351 F. Supp. 2d 1090, 1099 (W.D. Wash. 2004) (citing 17 U.S.C. § 512(k)(1)(B)).  "The DMCA was enacted [] to provide immunity to service

providers from copyright infringement liability" for "passive," "automatic" actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider. H.R. Conf. Rep. No. 105-796, at 72 (1998), reprinted in 1998 U.S.C.C.A.N. 649; H.R.Rep. No. 105-551(I), at 11 (1998)." *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (quoted by *Perfect 10, Inc. v. CCBill LLC*, 340 F. Supp. 2d 1077, 1086 (C.D. Cal. 2004)). Defendant's business model is not passive or automatic, but rather requires teams of employees who use computers to manipulate images (including Plaintiff's), print them, inspect them, apply them to products that Defendant sources and prices, inspect them again, finish them, inspect them again, package them, and ship them, all in the physical world and outside of the Internet. Businesses that play such an active role do not fit the definition of an internet 'service provider.' See *Agence France Presse v. Morel*, 934 F. Supp. 2d 547, 566 (2013) and *Gardner v. CafePress Inc.*, 2014 WL 794216 (S.D. Cal. 2014). Defendant's activities "more closely resembles the mere sale of goods [] than facilitating users' activities online." *Morel* at 566. To be sure, Defendant's primary infringements do not happen online at all "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by" Defendant, see 17 U.S.C. § 512(c), but rather by reason of Defendant's own unauthorized printing of images, application of those images to derivative products and sale and distribution of those products.

2. Even if Defendant were found to meet the definition of a 'service provider' under the DMCA, it doesn't meet two important requirements to qualify for the 17 U.S.C. § 512(c) safe harbor. First, Defendant had actual knowledge that the material or an activity using the material on the system or network

was infringing, see 17 U.S.C. § 512(c)(1)(A)(i); or at the very least was aware of facts or circumstances from which infringing activity was apparent, see 17 U.S.C. § 512(c)(1)(A)(ii).  Defendant received multiple notices over the course of several years from Plaintiff, which should have indicated a systemic problem involving Plaintiff's images.  Defendant also agreed to accept a catalog containing the majority of Plaintiff's images, yet continued to infringe those very same images.   Second, Defendant received a financial benefit directly attributable to its infringing activity, in a case in which it had the right and ability to control such activity. See 17 U.S.C. § 512(c)(1)(B).  A directly attributable financial benefit exists "where there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1044 (9th Cir. 2013).  Defendant received a financial benefit from its infringing use of Plaintiff's Images, because each time a customer chose a GYP Image from the Defendant Marketplace and purchased a corresponding product custom made by Defendant, Defendant brought in revenue directly from the sale of the infringing product.  Defendant also had control in every instance that it made an infringing sale because it was the party that actually priced the base products, printed the infringing images, manufactured the custom products from the infringing reproductions and distributed them.  Control may exist where the service provider is "actively involved in the listing, bidding, sale and delivery" of items offered for sale.  See *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001).  Because Defendant can be shown to have the "right and ability to control" the infringing activity, and because it receives "a financial benefit directly

attributable to the infringing activity," Defendant cannot satisfy the requirements of 17 U.S.C. § 512(c)(1)(B).

Respectfully submitted,

Dated: March 28, 2017          LAW OFFICES OF JEFFREY YOUNG

By:     /s/ Jeffrey S. Young
Jeffrey S. Young, Attorney for
Plaintiff Greg Young Publishing, Inc.