1  Timothy J. Halloran – 104498
       THalloran@mpbf.com
2  Keith G. Adams – 240497
       KAdams@mpbf.com
3  Dina M. Zagari – 278627
       DZagari@mpf.com
4  MURPHY, PEARSON, BRADLEY & FEENEY
   550 S. Hope Street, Suite 650
5  Los Angeles, CA  90071
   Telephone:   (213) 327-3500
6  Facsimile:    (213) 627-2445

7  Attorneys for Defendant
   ZAZZLE INC.

8

9              **UNITED STATES DISTRICT COURT**

10     **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

11

| | |
|---|---|
| 12  GREG YOUNG PUBLISHING, INC., a corporation, | Case No.: 2:16-CV-04587-SVW-KS |
| 13 | **DEFENDANT ZAZZLE INC.'S** |
| 14              Plaintiff, | **OPPOSITION TO PLAINTIFF GREG YOUNG PUBLISHING, INC.'S MOTION FOR PARTIAL** |
| 15          v. | **SUMMARY JUDGMENT** |
| 16  ZAZZLE INC., a corporation, and DOES 1 TO 10, | *Opposition Memorandum, Declaration of Keith Adams,* |
| 17              Defendants. | *Evidentiary Objections, and Statement of Genuine Disputes of Material Fact* |
| 18 | *All Filed Concurrently* |
| 19 | **Hearing** |
| 20 | Date:       April 24, 2017<br>Time:       1:30 p.m.<br>Place:      First Street Courthouse |
| 21 | Room:      Courtroom 10A |
| 22 | Complaint Filed:  June 23, 2016 |
| 23 | FPTC Date:       June 12, 2017<br>Trial Date:        June 20, 2017 |

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................... 3

    A.     The Website And User-Uploaded Content .................................. 3

    B.     Initial Review Of Uploaded Images And Content ....................... 3

    C.     The Content Management Team .................................................. 4

    D.     Order Fulfillment ....................................................................... 4

    E.     Reports of Violations ................................................................. 4

    F.     "GYPI" Images .......................................................................... 5

III.    LEGAL STANDARD ............................................................................ 5

IV.     ARGUMENT ......................................................................................... 6

    A.     The DMCA And Its "Safe Harbor" Provisions............................ 6

    B.     Zazzle Qualifies For The Section 512(c) "Safe Harbor" ............ 7

        1.     The Components Of "Safe Harbor" Protection ................. 7

        2.     Zazzle Is A "Service Provider" Under Section 512(k)...... 7

            a.     "Service Provider" Is Broadly Defined Under Section 512 ...................................................... 7

            b.     The *Gardner* Opinion Does Not Support Plaintiff's Position And Is Erroneous In Any Event ........................... 10

            c.     Plaintiff's Interpretation Of "Service Provider" Would Gut The "Safe Harbor" Of Section 512(c) ........... 12

        3.     Zazzle Has A "Reasonable" Repeat Infringer Policy And Adopts Standard Technical Measures Under Section 512(i) ........ 13

        4.     Zazzle Meets All Of The Criteria Of Section 512(c) ..................... 14

            a.     Zazzle Did Not Have Actual Knowledge Of Infringement .................................................. 15

            b.     Zazzle Lacks The Ability To Control The Alleged Infringement .................................................. 18

DEFENDANT ZAZZLE INC.'S OPPOSITION TO PLAINTIFF GREG YOUNG
PUBLISHING, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

CASE NO. 2:16-CV-04587

**TABLE OF CONTENTS**
(continued)

Page

c.   Zazzle Did Not Financially Benefit From Alleged
Infringements It Could Control .............................................. 20

V.   CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Agence France Presse v. Morel*,
934 F. Supp. 2d 547 (S.D.N.Y. 2013) ................................................................ 10, 11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................................... 5

*Capitol Records, LLC v. Vimeo, LLC*,
952 F. Supp. 2d 500 (S.D.N.Y. Sept. 18, 2013) ........................................................ 9

*Clark v. Citizens of Humanity, LLC*,
97 F. Supp. 3d 1199 (S.D. Cal. 2015) ........................................................................ 9

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ............................................................... 9, 12, 14, 17

*Corbis Corp. v. Amazon.com*, Inc.,
351 F. Supp. 2d 1090 (W.D. Wash. 2004) ............................................................... 13

*Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*,
606 F.3d 612 (9th Cir. 2010) .................................................................................... 13

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) .................................................................................... 6

*Gardner v. CafePress Inc.*,
2014 WL 794216 (S.D. Cal. Feb. 26, 2014) ................................................... 10, 11, 12

*Hendrickson v. eBay, Inc.*,
165 F. Supp. 2d 1082 (C.D. Cal. 2001) .............................................................. 12, 18

*In re Aimster Copyright Litig.*,
252 F. Supp. 2d 634 (N.D. Ill. 2002) ......................................................................... 9

*Io Grp., Inc. v. Veoh Networks, Inc.*,
586 F. Supp. 2d 1132 (N.D. Cal. 2008) ................................................................... 17

*Mavrix Photographs LLC v. LiveJournal, Inc.*,
2014 WL 6450094 (C.D. Cal. Sept. 19, 2014) ......................................................... 18

*MGM Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ..................................................................................................... 6

*Obodai v. Demand Media, Inc.*,
2012 WL 2189740 (S.D.N.Y. June 13, 2012) ............................................................ 9

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007)......................................... 2, 6, 14, 15, 16, 17, 18, 20

*Portsmouth Square Inc. v. Shareholders Protective Committee*,
770 F.2d 866 (9th Cir. 1985)....................................................................................... 6

- iii -

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Rosen v. eBay, Inc.*, No. CV 13-6801 MWF EX,
2015 WL 1600081 (C.D. Cal. Jan. 16, 2015) ............................................................... 19

*Tur v. YouTube, Inc.*,
2007 WL 1893635 (C.D. Cal. June 20, 2007) ............................................................... 18

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
718 F.3d 1006 (9th Cir. 2013) ..............................................1, 2, 6, 8, 10, 11, 12, 13, 16

*Ventura Content, Ltd. v. Motherless, Inc.*,
2013 WL 11237204 (C.D. Cal. July 3, 2013) ................................................... 15, 17, 18

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) ............................................................................................... 8

*Wolk v. Kodak Imaging Network, Inc.*,
840 F. Supp. 2d 724 (S.D.N.Y. Jan 3, 2012) .............................................................. 8, 9

### STATUTES

17 U.S.C.
§ 512 .............................................................................................................................. 1, 6

17 U.S.C.
§ 512(a) .............................................................................................................................. 7

17 U.S.C.
§ 512(c) ...............................................................................................7, 8, 12, 14, 15, 20

17 U.S.C.
§ 512(c)(1) .......................................................................................................................... 1

17 U.S.C.
§ 512(c)(1)(B) ................................................................................................................. 18

17 U.S.C.
§ 512(c)(A)(2) ................................................................................................................. 17

17 U.S.C.
§ 512(i) ............................................................................................................................... 7

17 U.S.C.
§ 512(i)(1) ........................................................................................................................ 13

17 U.S.C.
§ 512(i)(1)(A) .................................................................................................................. 18

17 U.S.C.
§ 512(i)(2) ........................................................................................................................ 13

# TABLE OF AUTHORITIES
(continued)

**Page**

17 U.S.C.
§ 512(k)(1) ............................................................................................................. 7

17 U.S.C.
§ 512(k)(1)(A) ...................................................................................................... 7

17 U.S.C.
§ 512(k)(1)(B) .......................................................................................... 1, 7, 8, 12

## OTHER AUTHORITIES

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright*
§ 12B.04[A][2] (Mathew Bender Rev. Ed., 2012) ........................................ 17

Digital Millennium Copyright Act
(Pub. L. No. 105-304 (1998) .......................................................................... 1

Senate Report 105-190
(May 11, 1998) ............................................................................................. 6

## RULES

Federal Rules of Civil Procedure
Rule 56(c) ....................................................................................................... 5

- v -

# I.   **INTRODUCTION**

Plaintiff Greg Young Publishing, Inc.'s ("GYPI") motion for partial summary judgment ("GYPI MSJ") ignores both well-settled Ninth Circuit law and the language of the statute it purports to address. GYPI argues that the "safe harbor" provisions of the Digital Millennium Copyright Act (Pub. L. No. 105-304 (1998); 17 U.S.C. § 512; "DMCA") do not apply to defendant Zazzle Inc. ("Zazzle") because Zazzle is not a "service provider."

GYPI submits a 22-page motion that does not cite the relevant statutory definition of "service provider" under the DMCA <u>once</u>. The reason for this omission is that the definition is too broad for GYPI: "'service provider' means a provider of online services or network access, or the operator of facilities therefor."  17 U.S.C. § 512(k)(1)(B).

Zazzle is a "service provider" under the statute, as it provides both online services and access to its network. Zazzle has a website, where users upload images for display. Those users, or third parties, can then purchase products with the uploaded images printed on them, for those products that the initial uploader has chosen to make available. GYPI's motion argues that if any part of a company's business is not that of a "service provider," then the company is not a "service provider" for any purpose. If that were the case, the <u>only</u> entities that could claim DMCA protection would be passive website operators. That is not the law. "Had Congress intended to include such a limitation, it would have said so expressly and unambiguously." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1019 (9th Cir. 2013).

GYPI also argues that, even if Zazzle is a "service provider," it does not meet the requirements of the 17 U.S.C. § 512(c)(1) safe harbor, because it had "actual knowledge" of the infringement, the right and ability to control the infringing activity, and received a financial benefit.

Zazzle did not have "actual knowledge" of any infringement. GYPI argues that Zazzle had "actual knowledge" because Zazzle "accepted" GYPI's image catalog, and GYPI's purported images had been uploaded in the past. That is <u>constructive</u>, not actual

- 1 -

knowledge. GYPI's motion does not bother to address controlling Ninth Circuit authority, *UMG Recordings, Inc.,* which required "specific knowledge of particular infringing activity" to establish actual knowledge. 718 F.3d at 1021. Zazzle had no prior actual knowledge of any infringement. When it had such knowledge, it acted swiftly to remove such images, as GYPI concedes.

Zazzle also does not have the "ability" to control every upload. Users affirm, when uploading material, that they have the right to upload the material. Recognizing that some users will nonetheless upload infringing material, Zazzle employs dozens of people to review 20,000 images per day, and also uses keyword searches and databases to filter infringing material to the best of its ability. But Zazzle does not have the ability to "reverse image" search every image uploaded onto its website, nor does it have a comprehensive library of every copyrighted image, nor a comprehensive database of copyright licenses, as would be required to "control" uploading of infringing images.

Zazzle did not receive any "financial benefit directly attributable to the infringing activity" – *i.e.*, the display of images on Zazzle's website. The financial benefit that GYPI attributes to Zazzle comes from the sale of products, not the protected display of images on Zazzle's website. And "financial benefit" requires the ability to control, which Zazzle lacked, even as to products physically sold.

As GYPI candidly admits, it was "after becoming frustrated" by the "the time consuming and costly process of having to police and notify Zazzle that [it] decided to bring its current lawsuit." GYPI MSJ at 5:2-5; *see also id.* at 4:13-15 ("This exercise has been not unlike a game of copyright enforce 'whack-a-mole'….") Congress made a policy determination in the DMCA to place "the burden of policing copyright infringement … squarely on the owners of the copyright." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007). It is GYPI's burden to police its purported copyrights, not Zazzle's. GYPI's complaints are properly addressed to Congress, not to Zazzle or this Court. GYPI's motion should be denied.

/ / /

## II.     STATEMENT OF FACTS

### A.     The Website And User-Uploaded Content

Zazzle operates the website www.zazzle.com (the "Website"). *See* Zazzle's Statement of Genuine Issues of Material Fact ("SGI"), ¶1. The Website hosts user-uploaded images, as well as products for third-party brand partners. SGI ¶2. Users upload image files, select the products they wish to sell and the royalty rates they wish to receive, and orient/edit the images as they deem fit; Zazzle is generally not involved in this process. SGI ¶27. Users can also upload personal, non-public images for display on their own account and for printing on physical products. SGI ¶28.[1] Zazzle estimates that it has 350 million products currently available, not counting private and customized products. SGI ¶29. Products are not automatically printed by Zazzle when users upload images to the Website; actual production only occurs when there is an order. SGI ¶30.

### B.     Initial Review Of Uploaded Images And Content

Zazzle relies on its users' compliance with its user agreements with respect to the initial uploading of content, to verify that they have read the agreements and have the right to sell products bearing the uploaded images. SGI ¶31. Zazzle also actively polices uploaded images for infringements through an electronic "hot list" of potential infringements (copyright and otherwise), as well as other violations of its policies, which is searched against user-determined metadata "tags" or keywords. SGI ¶32. Zazzle itself only has the ability to directly search the textual "hot list." SGI ¶33. However, some third-party services (*e.g.*, Google) allow "reverse image" searches of individual sites, such as Zazzle. SGI ¶34. Zazzle itself lacks the ability to search its Website through a "reverse image search," other than through such third-party services. SGI ¶35. Zazzle's Website offers a "search" function, which searches through the user-determined metadata "tags" or keywords, which search function Zazzle itself uses to search for infringements and policy violations. SGI ¶36.

---

[1] GYPI argues that Zazzle has not policed these "personal" images, and that Zazzle's accounting is therefore incomplete. GYPI MSJ at 3:1-13. GYPI presents no evidence in support of its assertions, which should be disregarded.

**C.      The Content Management Team**

When an order is received for a first-time order of a product, a customization of an existing design or product, or under certain other circumstances, members of the Content Management Team ("CMT"), known as "Reviewers," evaluate the order to ensure that it complies with Zazzle's policies. SGI ¶37. Zazzle's CMT reviews approximately 20,000 images per day, each of which can be displayed on numerous products. SGI ¶38. Reviewers may do research (*e.g.*, Google searches) to determine if there are copyright issues. SGI ¶40. Reviewers may use external reverse image searches to determine if images are copyright protected, if they are in doubt. SGI ¶41. Reviewers also apply additional scrutiny if the designer who uploaded the image has had images "flagged" for review in the past. SGI ¶42. The CMT operates with several layers of oversight, with individual Reviewers "flagging" images for review, and supervisors making final decisions. SGI ¶43. Zazzle maintains a database of products that tracks violations of its terms, including its copyright terms. SGI ¶44.

Reviewers spend approximately 30 seconds to a minute on average reviewing each image. SGI ¶45. Of the 20,000 images reviewed each day on average, approximately 5 to 6 percent are not approved. SGI ¶46. About half of the rejections are due to "content" issues, including copyright and trademark issues. SGI ¶47. A single image can be used on hundreds of products, and therefore give rise to hundreds of "violations" or removals. SGI ¶48.

**D.      Order Fulfillment**

After approval by the CMT, the order is then fulfilled by Zazzle and/or a third party. SGI ¶49. Once an order is approved and sent to manufacturing, it is manufactured, typically by Zazzle, with as little human "touch" as possible. SGI ¶50. The software determines where and how articles are printed. SGI ¶51.

**E.      Reports of Violations**

Copyright owners contact Zazzle through a wide variety of means – through website links, e-mails, letters, facsimiles, and phone calls, and directed at a wide variety

- 4 -

1  of individuals. SGI ¶52. Zazzle contacts users whose uploaded images are subject to

2  copyright complaints. SGI ¶53. Zazzle regularly terminates accounts when there is

3  questionable content and/or repeated issues with an account. SGI ¶54. Zazzle also

4  terminates accounts where users engage in overt copyright violations. SGI ¶55. When

5  terminating accounts, Zazzle also takes into account repeated claims of violations from

6  copyright owners. SGI ¶56.

7  **F.    "GYPI" Images**

8      Having received complaints from GYPI, Zazzle searched for and removed images

9  GYPI purported to own to the best of its ability, through searching for associated text

10 terms. SGI ¶57. GYPI admitted, through counsel, that it was pleased with Zazzle's

11 compliance with the DMCA notice and takedown procedures. SGI ¶58. GYPI also

12 admitted that, in every instance in which it complained of infringements to Zazzle,

13 Zazzle took down the offending material. SGI ¶59. GYPI itself cannot always tell when

14 work is infringing, as it sent an improper "takedown" notice as to a vintage-style poster

15 that merely used the same source material as GYPI's alleged work. SGI ¶60.

16 Notwithstanding Zazzle's safeguards, as the takedown process relies on the human

17 review described above as well as the textual "hot list," there were sales of certain

18 products that bore images that GYPI claims the rights to. SGI ¶61.

19                            **III.    LEGAL STANDARD**

20      Summary judgment may only be granted if the evidence "[shows] that there is no

21 genuine issue as to any material fact and that the moving party is entitled to judgment as

22 a matter of law." F.R.C.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50

23 (1986). The moving party bears the burden of identifying credible evidence that

24 demonstrates the absence of a genuine issue of material fact for trial. *Id.* at 256. The

25 court must resolve all ambiguities and draw all reasonable inferences *against* the

26 moving party. *Id.* at 255. Courts have the inherent power to order summary judgment

27 *sua sponte* against the moving party, as it had "a full and fair opportunity to develop and

28 present facts and legal arguments in support of its position" and "reasonable notice that

- 5 -

DEFENDANT ZAZZLE INC.'S OPPOSITION TO PLAINTIFF GREG YOUNG          CASE NO.
PUBLISHING, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT             2:16-CV-04587

1   the sufficiency of his or her claim will be in issue." *Portsmouth Square Inc. v.*

2   *Shareholders Protective Committee*, 770 F.2d 866, 869 (9th Cir. 1985).

3                              **IV.   <u>ARGUMENT</u>**

4   **A.   The DMCA And Its "Safe Harbor" Provisions**

5          The Supreme Court and Congress have recognized that in addressing copyright

6   infringement, especially on the internet, copyright protection must always be balanced

7   against the importance of encouraging technological innovation. *See MGM Studios Inc.*

8   *v. Grokster, Ltd.*, 545 U.S. 913, 928 (2005) ("The more artistic protection is favored, the

9   more technological innovation may be discouraged; the administration of copyright law

10  is an exercise in managing the tradeoff.") In 1998, Congress created a set of statutory

11  "safe harbors" for companies doing business online when it enacted the Digital

12  Millennium Copyright Act ("DMCA"), which shields Internet "service providers" from

13  liability for copyright infringement claims. 17 U.S.C. § 512. Congress recognized that in

14  "the ordinary course of their operations, service providers must engage in all kinds of

15  acts that expose them to potential copyright infringement liability." S. Rep. 105-190

16  (May 11, 1998) at 8. The DMCA aims to "facilitate the robust development and world-

17  wide expansion of electronic commerce, communications, research, development, and

18  education in the digital age" (*id.* at 1-2), by limiting service providers' "legal exposure

19  for infringements that may occur in the course of their activities." *Perfect 10, Inc. v.*

20  *Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) (quoting *Ellison v. Robertson*,

21  357 F.3d 1072, 1076 (9th Cir. 2004)).

22         Congress enacted these safe harbors despite the knowledge that online services

23  "are capable of being misused to facilitate copyright infringement." *UMG Recordings,*

24  *Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013). Indeed, in

25  enacting the "safe harbors," Congress "placed the burden of policing copyright

26  infringement—identifying the potentially infringing material and adequately

27  documenting infringement—squarely on the owners of the copyright." *Perfect 10, Inc.,*

28  488 F.3d at 1113. Zazzle, along with countless other companies, from cable companies

DEFENDANT ZAZZLE INC.'S OPPOSITION TO PLAINTIFF GREG YOUNG          CASE NO.
PUBLISHING, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT              2:16-CV-04587

to content websites to media companies to social networking sites, rely on those "safe harbor" protections.

**B.      Zazzle Qualifies For The Section 512(c) "Safe Harbor"**

**1.      The Components Of "Safe Harbor" Protection**

Zazzle is protected under the "safe harbor" of 17 U.S.C. § 512(c). To qualify for protection under the safe harbor, a party must meet a set of criteria. First, a party must demonstrate it is a "service provider" as defined by 17 U.S.C. § 512(k)(1)(B). Second, a party must satisfy certain "conditions of eligibility" set forth in 17 U.S.C. § 512(i). Third, a party must satisfy the requirements of 17 U.S.C. § 512(c) itself. Zazzle easily meets all of these criteria.

**2.      Zazzle Is A "Service Provider" Under Section 512(k)**

GYPI attempts to argue that a "service provider" under the DMCA is limited to an entity that "only play a passive and automatic role." GYPI MSJ at 14:7-19. Neither the statute nor the case law supports GYPI's reading.

**a.      "Service Provider" Is Broadly Defined Under Section 512**

The DMCA defines service provider in two ways, depending upon which safe harbor is at issue. 17 U.S.C. § 512(k)(1). For purposes of § 512(c), "service provider" is defined simply as "a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A)." 17 U.S.C. § 512(k)(1)(B).[2] The Ninth Circuit recognizes that sub-section (k)(1)(B) embraces a broad definition of service provider:

> [If] Congress wanted to confine § 512(c) exclusively to web
> hosts rather than reach a wider range of service providers,

---

[2] GYPI's arguments about "automatic" processes would apply better to the narrower definition of "service provider" under Section 512(k)(1)(A), which applies to the Section 512(a) safe harbor. *Compare* 17 U.S.C. § 512(k)(1)(B) *with* § 512(k)(1)(A) (defining, as to Section 512(a) <u>only</u>, "service provider" as an "entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received").

1               we very much doubt it would have done so with the oblique

2               'by reason of storage' language… Had Congress intended to

3               include such a limitation, it would have said so expressly and

4               unambiguously ....

5  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1019 (9th

6  Cir. 2013).

7        The Ninth Circuit recognized that the safe harbor applies to activities that go

8  beyond the mere storage of infringing material: "Under the broader definition applying

9  to § 512(c) … there is no limitation on the service provider's ability to modify user-

10  submitted material to facilitate storage and access…." *UMG Recordings, Inc.*, 718

11  F.3d at 1019. A company can modify material, so long as it does not "actively

12  participate in or supervise file uploading ... [or] preview or select the files before the

13  upload is complete." *Id.* at 1020. There is no legal support for GYPI's suggestion

14  that service providers are limited to playing a "passive and/or automatic role" (GYPI

15  MSJ at 14:7), an argument directly repudiated by the Ninth Circuit. *See UMG*

16  *Recordings, Inc.*, 718 F.3d at 1019-1020 (holding that company was a service provider

17  even though it created smaller file copies, transcoded user videos, prominently

18  displayed those videos on its homepage, allowed unrelated users to stream or watch the

19  videos, and even allowed unrelated users to download videos for offline access).

20        The Section 512(k)(1)(B) definition of "service provider" encompasses a

21  wide range of entities. Virtually every court has found that websites that host user-

22  uploaded images and videos fall within the definition of "service provider" under

23  sub-section (k)(1)(b). *See, e.g., Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 39

24  (2d Cir. 2012) (noting that "service providers—including YouTube—fall[] under

25  § 512(c)" and holding that Section 512(c) "'is clearly meant to cover more than

26  mere electronic storage lockers'"); *Wolk v. Kodak Imaging Network, Inc.*, 840 F.

27  Supp. 2d 724, 744 (S.D.N.Y. Jan 3, 2012) ("Because Photobucket offers a site that

28  hosts and allows online sharing of photos and videos at the direction of users,

- 8 -

1   Photobucket, like YouTube.com or Veoh.com, qualifies as a 'service provider' ...");

2   *Obodai v. Demand Media, Inc.*, 2012 WL 2189740, at *3 (S.D.N.Y. June 13, 2012)

3   (holding that "service provider" includes a "site permits users to share content

4   online," and that "a service provider under section 512(k)(1)(B) may ... post[] and

5   [syndicate] videos"); *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 658 (N.D.

6   Ill. 2002) ("'[Service] provider' is defined so broadly that we have trouble

7   imagining the existence of an online service that would not fall under the

8   definition ...") (cited by GYPI); *Capitol Records, LLC v. Vimeo, LLC*, 952 F. Supp.

9   2d 500, 511 (S.D.N.Y. Sept. 18, 2013) (holding that "a provider of online services

10  that hosts and distributes user material by permitting its users to upload, share and

11  view videos," qualified as a service provider "[even] though [its] activities are not

12  limited to such").

13      Nor do online "service providers" lose that status merely because they offer

14  offline services.[3] In *Wolk,* the court concluded that a website where users could

15  upload photos remained a service provider even where, like Zazzle, the website

16  offered a service whereby those uploaded photos could be physically printed. 840 F.

17  Supp. 2d at 730, 744. In

18      GYPI's attempt to replace the statutory definition with an amorphous

19  "Qualified Service Provider" standard, a phrase repeated *ad nauseum* throughout its

20  motion, must be rejected. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d

21  1020, 1042–43 (9th Cir. 2013) ("[We] will not read requirements into the safe

22  harbors that are not contained in the text of the statute.") Zazzle's Website simply

23  provides a platform for designers to upload designs, at their direction. Zazzle offers

24  tools for *users* to modify the content that they choose to upload, but Zazzle itself is not

---

[3] GYPI attempts (at GYPI MSJ at 17:4-12) to analogize to *Clark v. Citizens of Humanity, LLC,* 97 F. Supp. 3d 1199 (S.D. Cal. 2015). *Clark* has no application here. It concerned a specific California labeling statute prohibiting the use of "Made in the U.S.A." where the article was "'entirely or substantially made, manufactured, or produced outside of the United States.'" *Id.* at 1204. There is no parallel limitation on "service provider" in the DMCA.

1   involved in its users' uploading of content. Zazzle easily falls within sub-section

2   (k)(1)(B)'s broad definition of "service provider."

3               **b.     The *Gardner* Opinion Does Not Support Plaintiff's Position**

4                        **And Is Erroneous In Any Event**

5           GYPI heavily relies on *Gardner v. CafePress Inc.,* 2014 WL 794216 (S.D. Cal.

6   Feb. 26, 2014), a case not binding on this Court, for its argument that Zazzle is not a

7   service provider at all, and entitled to no DMCA protection.

8           There are two fundamental problems with GYPI's arguments. GYPI

9   misrepresents the holding of *Gardner*, and that holding was wrongly decided.

10          Plaintiff first implies that in *Gardner*, the court held that CafePress, a supposed

11  competitor of Zazzle, was not a "service provider," and asks that "a similar decision

12  should be made here that Zazzle is not a Qualified Service Provider." GYPI MSJ at

13  14:20-15:13. In fact, *Gardner* was a ruling on *CafePress'* motion for summary

14  judgment, which asked for a determination that it was entitled to a DMCA defense as a

15  matter of law. 2014 WL 794216 at *1. The Court in *Gardner* examined the holding in

16  *UMG Recordings, Inc., supra,* and found that it could not determine, as a matter of law,

17  that CafePress <u>was</u> a service provider for all purposes, thereby leaving the matter for

18  trial. *Id.* at *4-5. The court in *Gardner* also drew distinctions between "service

19  provider" activities, to which the DMCA could apply, and "non-'service provider'

20  activities," to which the defense would not apply – the same distinctions GYPI seeks to

21  erase. 2014 WL 794216, at *8. *Gardner* merely held that CafePress could not establish

22  its DMCA defense as a matter of law as to <u>all</u> of its activities. Here, GYPI would have

23  this Court go much further, and affirmatively find that Zazzle is <u>not</u> a service provider,

24  as to <u>any</u> of its activities, as a matter of law. [4]

25  _____

    [4] *Agence France Presse v. Morel*, 934 F. Supp. 2d 547 (S.D.N.Y. 2013), also relied on by
26  GYPI, is similarly limited. In *Morel*, the alleged infringers purported to license rights they
    legally could not grant, and opinion focused on infringement and the scope of the license.
27  As to the DMCA defense, there was a disputed factual issue as to whether "human
    intervention may have been necessary to allow the Photos–at–Issue to publish." *Id.* at 553.
28  Furthermore, "each of these safe harbors is generally directed toward protecting entities
    that 'do something useful' for others with respect to providing or facilitating access to

1   In addition, in *Gardner*, CafePress affirmatively sought a ruling that products it
2   had actually sold to customers were protected by the DMCA. 2014 WL 794216, at *2-3
3   (noting that there was a sale of a physical product for each work at issue). *Gardner* was
4   <u>not</u> primarily examining CafePress' website service, but its sale of physical goods.
5   GYPI here, with its argument that Zazzle is not a service provider at all, seeks a ruling
6   that Zazzle is not entitled to a DMCA defense for images that were only <u>ever</u> displayed
7   on the Website and were never put on physical products. *See* Dkt. 41 (Answer to
8   Amended Complaint), ¶97 (noting, with respect to the DMCA Safe Harbor defense, the
9   artworks where "no sales of products were associated with any alleged display of the
10  purportedly infringing images by Zazzle"). This goes far beyond the limited scope of
11  *Gardner*.

12  Even the actual, limited holding in *Gardner* erred. *Gardner* found that it could not
13  find CafePress to be a service provider because it went beyond "facilitating the sale of
14  products between internet users by directly selling products to online shoppers." 2014
15  WL 794216, at *5. *Gardner* erred in suggesting that the subsequent production and
16  distribution of images on physical products meant that CafePress was possibly not a
17  "service provider." There is nothing in the text of the DMCA or Ninth Circuit precedent
18  to support this view.

19  In fact, the Ninth Circuit has held that websites that take a wide variety of actions
20  with respect to user-uploaded content are nonetheless "service providers." *See UMG*
21  *Recordings, Inc.*, 718 F.3d at 1019-1020. The reason these features were not deemed
22  material in *UMG Recordings, Inc.* is because the "service provider" inquiry turns on
23  whether the material was stored at the direction of a user, not on any other activity the
24  service provider undertakes. *See UMG Recordings, Inc.*, 718 F.3d at 1018-20
25  (explaining that the test employs "but for" causation); *Hendrickson v. eBay, Inc.*, 165 F.

26
27  materials online or the activities of internet users," while the companies in that case were
    merely acting as copyright licensors. *Id.* at 566. Even then, it was a "disputed factual
28  issue" as to whether the companies were "service providers" – there was no ruling that
    they were not as a matter of law, as GYPI seeks here.

1    Supp. 2d 1082, 1088 (C.D. Cal. 2001) (holding that the safe harbor applied to the sale

2    and distribution of pirated copies of work on eBay); *Columbia Pictures Indus., Inc.*, 710

3    F.3d at 1042 (holding that Section 512(c) "explicitly covers not just the storage of

4    infringing material, but also infringing 'activities' that 'use the material stored on the

5    system or network'") (internal quotations and modifications omitted).[5] Here, the

6    copyrighted materials allegedly infringed were uploaded at the direction of users, and

7    Zazzle is a "a provider of online services or network access" within Section

8    512(k)(1)(B).

9           c.    **Plaintiff's Interpretation Of "Service Provider" Would Gut**

10                **The "Safe Harbor" Of Section 512(c)**

11          There is no basis to distinguish between Zazzle, which operates a website and

12   sells physical goods, and similar ecommerce sites like Amazon and eBay that do the

13   exact same thing. As made clear by the Ninth Circuit, "if Congress wanted to confine

14   § 512(c) exclusively to web hosts rather than a wider range of service providers," it

15   could have done so by "clarifying in the definition of 'service provider' that, as it

16   applies to § 512(c), only web hosts qualify." *UMG Recordings, Inc.*, 718 F.3d at 1019.

17          Plaintiff impliedly concedes that Zazzle's Website, on its own, would fall under

18   the DMCA. *See* GYPI MSJ at 17:17-21 ("[While] the online platform by itself and

19   absent Zazzle's other activities might be protected by a DMCA safe harbor if it were

20   operated by a Qualified Service Provider ....") What GYPI attempts to do is shift the

21   entire "safe harbor" analysis onto the "service provider" definition of sub-section

22   512(k)(1)(B), saying that if a company is anything other than "a provider of online

23   services or network access," it is not a "service provider."

24          If GYPI's arguments were accepted, very few, if any, companies would qualify as

25   ――――――――――――――――――――

26   [5] *Gardner* also seemed to find that the "policy of determining retail prices for products
     sold through the Marketplace and paying users only a royalty or commission for the sale
     of their products" was relevant. 2014 WL 794216 at *5. DMCA eligibility does not turn

27   on sales, pricing, or other activities performed by an Internet service provider because
     there is nothing inherently infringing (or noninfringing) about setting prices on a

28   website.

"service providers." This novel argument is directly contrary to the law cited above and the Ninth Circuit's holding in *UMG Recordings, Inc., supra*. There is nothing in the case law or statute to suggest that companies with a presence in the real world are somehow not service providers. Rather, case after case has found that companies such as Amazon, with definite presence in the real world, are "service providers." *See, e.g., Corbis Corp. v. Amazon.com*, Inc., 351 F. Supp. 2d 1090, 1100 (W.D. Wash. 2004) ("Amazon operates web sites, provides retail and third party selling services to Internet users, and maintains computers to govern access to its web sites" but was still a "service provider.") (overruled on other grounds as stated in *Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 616 (9th Cir. 2010)).

### 3. Zazzle Has A "Reasonable" Repeat Infringer Policy And Adopts Standard Technical Measures Under Section 512(i)

To satisfy the "conditions of eligibility" for the DMCA safe harbors, a service provider must: (1) have adopted and reasonably implemented a copyright infringement policy that provides for the termination of repeat infringers; and (2) accommodate and not interfere with standard technical measures. 17 U.S.C. § 512(i)(1). "Standard technical measures" are defined as follows:

> ... technical measures that are used by copyright owners to identify or protect copyrighted works and—(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process; (B) are available to any person on reasonable and nondiscriminatory terms; and (C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

17 U.S.C. § 512(i)(2). "Repeat infringers" is not defined in the statute. *See Corbis Corp.,* 351 F. Supp. 2d at 1100–01. However, the Ninth Circuit has held as follows with respect to the reasonableness of repeat infringer policies:

> We hold that a service provider "implements" a policy if it has

1  a working notification system, a procedure for dealing with
2  DMCA-compliant notifications, and if it does not actively
3  prevent copyright owners from collecting information needed
4  to issue such notifications. The statute permits service providers
5  to implement a variety of procedures, but an implementation is
6  reasonable if, under "appropriate circumstances," the service
7  provider terminates users who repeatedly or blatantly infringe
8  copyright.

9  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (citations omitted).

10  GYPI's motion "concede[s], for purposes of this Motion only, that Zazzle has

11  satisfied these requirements." GYPI MSJ at 11:25-27. In fact, the undisputed evidence

12  confirms that Zazzle has satisfied these requirements for all purposes, not just on this

13  motion. Zazzle has a working notification system – indeed, GYPI used that very system

14  and was "pleased" with results. SGI ¶¶52, 57-58. Copyright owners have access to the

15  same text searches on the Website and the same "reverse-image" searches from third-

16  parties that Zazzle uses. SGI ¶¶34-36. The search tools are available to "any person" on

17  "reasonable and nondiscriminatory terms." Zazzle also terminates users that "repeatedly

18  or blatantly" infringe on copyrights. SGI ¶¶54-56.

19  **4.    Zazzle Meets All Of The Criteria Of Section 512(c)**

20  For service providers who meet the criteria of sub-sections (k) and (i), Section

21  512(c) provides a safe harbor for "information residing on systems … at the direction of

22  users." 17 U.S.C. § 512(c). Furthermore, "[Section] 512(c) explicitly covers not just the

23  storage of infringing material, but also infringing 'activities' that 'use the material

24  stored on the system or network.'" *Columbia Pictures Indus., Inc.*, 710 F.3d at 1042-43.

25  A service provider is not liable "for infringement of copyright by reason of the storage

26  at the direction of a user of material that resides on a system" if it can demonstrate that

27  it:

28  (A) (i) does not have actual knowledge that the material or an

- 14 -

activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement ... responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

Zazzle meets all of these criteria. GYPI concedes that it "does not challenge, and therefore will not discuss, the third condition regarding expeditious removal." GYPI MSJ at 11:27-28.

### a.      Zazzle Did Not Have Actual Knowledge Of Infringement

Section 512(c)'s protections apply to service providers that "either (1) have no actual knowledge and no awareness of facts or circumstances from which infringing activity is apparent or (2) expeditiously remove or disable access to infringing material of which it knows or is aware." *Ventura Content, Ltd. v. Motherless, Inc.,* 2013 WL 11237204, at *6 (C.D. Cal. July 3, 2013) (citing *UMG Recordings, Inc.*, 718 F.3d 1006 at n.11) (internal quotation marks and alteration omitted). Service providers do not have the burden of determining whether materials on its system or network are actually illegal. *See, e.g., Perfect 10, Inc.,* 488 F.3d at 1111 ("A service provider need not affirmatively police its users for evidence of repeat infringement.")

As the Ninth Circuit held in a controlling decision that GYPI did not bother to

- 15 -

1   acknowledge, "specific knowledge of particular infringing activity" is required to

2   establish actual knowledge. *UMG Recordings, Inc.*, 718 F.3d at 1021. "[Merely] hosting

3   a category of copyrightable content … with the general knowledge that one's services

4   could be used to share infringing material, is insufficient to meet the actual knowledge

5   requirement." *Id.* at 1022. The burden is on copyright holders to identify and police their

6   own copyrights for the reason that they, not service providers, have the requisite

7   knowledge: "Copyright holders know precisely what materials they own, and are thus

8   better able to efficiently identify infringing copies than service providers …." *Id.* The

9   Ninth Circuit has repeatedly "'declined to shift that substantial burden from the

10  copyright owner to the provider.'" *Id.* (citing *Perfect 10, Inc.*, 488 F.3d at 1113).

11          Plaintiff contends that Zazzle had actual knowledge of the infringing material by

12  way of multiple notices from Plaintiff over the years, which Plaintiff argues should have

13  indicated a systematic problem. That is clearly legally insufficient under *UMG*

14  *Recordings, Inc.*, because it is not "specific knowledge of particular infringing activity."

15  Plaintiff's argument is based on constructive, not actual, knowledge. And, as GYPI

16  concedes, when Zazzle had actual knowledge, it expeditiously removed the images in

17  question. GYPI MSJ at 11:27-28; SGI ¶¶57-58. Indeed, Zazzle went beyond its legal

18  obligations, searching for terms potentially associated with GYPI, and removing

19  material even before GYPI had requested. SGI ¶57. GYPI goes so far as to try and twist

20  its provision of its image catalog to Zazzle as proof of knowledge (GYPI MSJ at 19:13-

21  17), when Zazzle was under no legal obligation to "accept" that catalog or use it to

22  search for images. Nor could Zazzle have "actual" knowledge of every image uploaded

23  and/or printed, as Zazzle does not have the ability to perform a "reverse image" search

24  on every image uploaded onto its website. SGI ¶35. Even if Zazzle had that technical

25  capability, it would have to have a database of every copyright claim and license (which

26  does not exist) in order to filter out infringing material.

27          GYPI's "knowledge" arguments are no more than an attempt to shift the burden

28  of policing its copyrights from GYPI to Zazzle, and turn Zazzle's voluntary attempts to

- 16 -

1   assist GYPI against Zazzle.[6]

2       Nor is there any basis for "red flag" liability "from which infringing activity is

3   apparent" under 17 U.S.C. § 512(c)(A)(2). GYPI, in a throwaway line without analysis

4   or legal support, blandly asserts that knowing GYPI images previously were uploaded

5   onto Zazzle's Website meant that "infringing activity was apparent" – what is known in

6   the case law as a "red flag" test. GYPI MSJ at 20:2-3. The "red flag" test is not nearly as

7   broad as GYPI pretends. The Ninth Circuit has firmly rejected a reading of the "red

8   flag" test that would have imposed "investigative duties on service providers" to

9   determine whether they were enabling infringement. *Perfect 10, Inc.*, 488 at 1114

10  (holding that sites with names such as "illegal.net" and "stolencelebritypics.com" were

11  not "red flags").

12      As this Court has observed, "the relevant inquiry is not whether the service

13  provider should have known that the material was infringing, but whether the service

14  provider 'deliberately proceeded in the face of blatant factors of which it was aware.'"

15  *Ventura Content, Ltd.,* 2013 WL 11237204, at *6 (citing 3 M. Nimmer & D. Nimmer,

16  *Nimmer on Copyright*, § 12B.04[A][2] (Mathew Bender Rev. Ed., 2012) and *Io Grp.,*

17  *Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1148 (N.D. Cal. 2008)). To establish

18  "red flag" knowledge, "the record must indicate that a service provider was subjectively

19  aware of facts that would have made it objectively obvious to the service provider that

20  the specific copyrights owned by the Plaintiff were being infringed." *Ventura Content,*

21  *Ltd.,* 2013 WL 11237204, at *7. GYPI does not, and cannot, cite to any such facts here.

22  *Cf. Columbia Pictures Indus., Inc.,* 710 F.3d at 1043-44 (individual had "red flag"

23  knowledge where he "actively encouraging infringement," by encouraging downloading

24  and burning of copyrighted works that were "sufficiently current and well-known that it

25  _____

26  [6] GYPI also asserts that "Zazzle also knew from its own records that it was actually
    taking orders and manufacturing products from the GYP Images." GYPI MSJ at 19:12-
27  13. This statement is unsupported by any record evidence and is deeply misleading.
    GYPI implies that, because Zazzle provided an accounting *after* products were sold and
28  *after* it was notified of infringement, that Zazzle "knew" it was committing infringement
    *before* receiving notice and knowledge.

DEFENDANT ZAZZLE INC.'S OPPOSITION TO PLAINTIFF GREG YOUNG          CASE NO.
PUBLISHING, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT             2:16-CV-04587

1  would have been objectively obvious to a reasonable person" that infringement was
2  occurring).

3      **b.    Zazzle Lacks The Ability To Control The Alleged Infringement**

4          The statute is clear that a provider's receipt of a financial benefit is only
5  implicated where the provider also has the right and ability to control the infringing
6  activity. *See* 17 U.S.C. § 512(c)(1)(B); *Perfect 10, Inc.,* 488 F.3d at 1111; *Ventura*
7  *Content, Ltd.*, 2013 WL 11237204, at *12.

8          The right and ability to control infringing activity has been held to mean
9  "something more" than just the ability of a service provider to remove or block access to
10  materials posted on its website or stored in its system." *Tur v. YouTube, Inc.,* 2007 WL
11  1893635, at *3 (C.D. Cal. June 20, 2007). "[The] 'right and ability to control' the
12  infringing activity … cannot simply mean the ability of a service provider to remove or
13  block access to materials posted on its website or stored in its system." *Hendrickson,*
14  165 F. Supp. 2d at 1093 (C. D. Cal. 2001). "To hold otherwise would defeat the purpose
15  of the DMCA and render the statute internally inconsistent" (*id.*) as companies would
16  have to "reasonably implement" policies to address "repeat infringers" under Section
17  512(i)(1)(A), without the "ability" to remove or block their materials. "Congress could
18  not have intended that a service provider loses immunity because it engages in acts that
19  are specifically required by the DMCA." *Hendrickson,* 165 F. Supp. 2d at 1094. Thus, a
20  companies' "limited monitoring of its website for 'apparent' infringements" does not
21  amount to "the right and ability to control infringing activities within the meaning of the
22  DMCA" as "Congress did not intend for companies such as eBay to be penalized when
23  they engage in voluntary efforts to combat piracy over the Internet." *Id.*

24          The right and ability to control requirement "presupposes some antecedent ability
25  to limit or filter copyrighted material." *Tur,* 2007 WL 1893635, at *3; *see also Mavrix*
26  *Photographs LLC v. LiveJournal, Inc.,* 2014 WL 6450094, at *14 (C.D. Cal. Sept. 19,
27  2014) (finding it "well settled that having the ability to remove or block access to
28  material, locate infringing material, or terminate users' access does not constitute

1   'control' sufficient to remove a service provider's safe harbor protection"); *Rosen v.*

2   *eBay, Inc.*, No. CV 13-6801 MWF EX, 2015 WL 1600081, at *12 (C.D. Cal. Jan. 16,

3   2015) (holding that "right and ability to control" requires a service to provide to

4   "'exert[] substantial influence on the activities of users,'" including "high levels of

5   control").

6          Here, Zazzle does not have the resources or ability to exert control over the

7   activities of its users. SGI ¶¶27-29. It is a Herculean task simply to monitor the 20,000

8   images a day. SGI ¶¶38-48. Even if Zazzle could employ individuals with perfect

9   knowledge of every copyright in existence, who took 30 seconds to review each image,

10  and who worked 24 hours a day, 7 days a week, it would take those people *333 years* to

11  review the underline existing 350 million images on Zazzle's website.[7] Without reverse image

12  search and filtering capabilities that Zazzle does not have, it is impossible to perfectly

13  monitor every image on Zazzle's Website, or even every image printed. Zazzle's mere

14  ability to remove infringing designs is not the "right and ability" to control the alleged

15  infringing activity.

16         GYPI argues that Zazzle has the ability to control because it "controls" the

17  manufacturing of products bearing user-uploaded images that third-parties choose to

18  purchase. GYPI MSJ at 21:17-22:14. This argument has no relevance as to images that

19  only appeared on the Website and were never produced, and GYPI itself concedes that

20  such products exist. SGI ¶23. Even as to physical products, GYPI offers no evidence

21  that Zazzle had the practical "ability" to control the infringement, since the production

22  process was effectively automatic, at least insofar as the printing of images was

23  concerned, after a product was ordered and approved by Zazzle's CMT. SGI ¶¶49-50.

24  At a minimum, this presents a disputed factual issue for trial as to goods physically sold.

25  / / /

26  / / /

---

27  [7]  350,000,000 divided by 2 images/minute (175,000,000 minutes), divided by

28  60 minutes/hour (2,916,666 hours), divided by 24 hours/day (for 121,527 days), divided by 365 days in a year (for 332.9 years)

c.      **Zazzle Did Not Financially Benefit From Alleged Infringements It Could Control**

As to the issue of financial benefit, GYPI states that Zazzle derived revenue from the sale of products custom made by Zazzle with infringing material. However, the "financial benefit" prong only applies if Zazzle had the "ability" to control the infringing activity, and Zazzle did not. Furthermore, the only alleged financial benefit received by Zazzle was from the sale of physical "products it sold bearing GYP's images." SGI ¶26. GYPI does not contend that the infringement constituted a draw or financial benefit based on Zazzle's Website itself. Thus, as to images that were only displayed on the website and never physically sold, GYPI has offered no evidence that Zazzle received any sort of financial benefit. Nor could Plaintiff: the Ninth Circuit has established a high standard for such claims, which GYPI does not even attempt to meet. *See, e.g., Perfect 10, Inc.,* 488 F.3d at 1117-1118 (holding that receiving a one-time set-up fee and flat, periodic payments for service from a person engaging in infringing activities would not constitute receiving a 'financial benefit directly attributable to the infringing activity'").

## V.      <u>CONCLUSION</u>

Zazzle's Website clearly falls within the DMCA safe harbor of Section 512(c) as a matter of law. GYPI's motion does not negate Zazzle's affirmative DMCA defense.

DATED:  April 3, 2017                    MURPHY, PEARSON, BRADLEY & FEENEY

                                        By _____
                                            Keith G. Adams
                                            Attorneys for Defendant
                                            ZAZZLE INC.

KGA.3104111.docx

- 20 -