UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case Nos.  2:16-CV-04587-SVW-KS                    Date  May 1, 2017

Title  *Greg Young Publishing, Inc. v. Zazzle, Inc.*                    Page  1 of 10

Present: The Honorable  STEPHEN V. WILSON, U.S. DISTRICT JUDGE

Paul Cruz                                          NOT REPORTED
Deputy Clerk                                       Court Reporter

Attorneys Present for Plaintiff(s)                 Attorneys Present for Defendant(s)
None Present                                       None Present

**Proceedings**:  IN CHAMBERS—ORDER RE:  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 49) AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 50)

On March 27, 2017, Defendant Zazzle, Inc. ("Zazzle") filed a motion for summary judgment. Doc. 49. The same day, Plaintiff Greg Young Publishing, Inc. ("GYPI") filed a motion for partial summary judgment. Doc. 50. The motions have been fully briefed (Docs. 69–70, 77–78), and are appropriate for resolution without oral argument. L.R. 7-15. The Court rules as follows:

## I.   BACKGROUND[1]

Greg Young is an individual who works in visual art publishing. Beginning in 1992, Young did business under the d/b/a "Greg Young Publishing" ("GYP"). Beginning in 2007, he began using the d/b/a "Greg Young International" ("GYI"). On December 18, 2007, he created GYPI, a California corporation.

Young has worked with a number of visual artists. Since 1999, Young has worked with Kerne Erickson to produce and market vintage-style art. And since 2010, Young has been the licensing agent for Scott Westmoreland, an artist who creates landscape and beach-themed art.

---

[1] This section draws upon Doc. 71 (GYPI's response to Zazzle's statement of undisputed facts) and Doc. 69-1 (Zazzle's response to GYPI's statement of undisputed facts).

Zazzle is a California corporation with its headquarters in Redwood City, California. It runs a website that allows users to upload images of artwork, slogans, and designs. Users can choose various consumer products they want the image to appear upon (e.g., coffee mugs, posters, t-shirts, etc.), and offer these products for sale to the public. When an order is placed, Zazzle will produce and deliver the product, paying a royalty to the user who uploaded the image appearing on the product.

GYPI alleges that Zazzle has publicly displayed 41 paintings by Westmoreland or Erickson on its website, and that Zazzle has created consumer products bearing these images. It asserts claims for copyright infringement and seeks injunctive relief, statutory damages (or, in the alternative, actual damages and restitution), and attorney's fees.

## II.  LEGAL STANDARD

The Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, the district court's "function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

The moving party bears the initial responsibility to point to the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party has the burden of proof at trial, the moving party can carry its initial burden either by submitting affirmative evidence that there is not a triable, factual dispute or by demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322. The burden then shifts to the nonmoving party "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 324). This means that the evidence is such that "a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Anderson*, 477 U.S. at 252). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.  ZAZZLE'S MOTION

### A.  Governing Law

A copyright is comprised of "the exclusive rights to do and to authorize any of the following": the reproduction, distribution, performance, or display of the work, the transmission of an audio recording of the work, or the preparation of derivative works. 17 U.S.C. § 106. Copyright ownership initially vests in the author, or, in the case of a work made for hire, in the author's employer. §§ 201 (a), (b). Ownership may be transferred, but only by written agreement. §§ 201(d), 204(a). Each of the six exclusive rights can be conveyed separately. *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002 (9th Cir. 2015). Each right

can also be subdivided, which means the owner can transfer part of his interest in an exclusive right while retaining an interest in the same right. *See id.* at 1002–04.

Only "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled … to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b).[2] It follows that "[t]he assignment of the bare right to sue for infringement, without the transfer of an associated exclusive right, is impermissible." *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013).

### B.   Westmoreland Copyrights

Zazzle moves for summary judgment on GYPI's claims for infringement of the Westmoreland copyrights. The material facts are not in dispute. GYPI and Westmoreland entered an agreement providing that GYPI would be Westmoreland's "exclusive representative" for soliciting, negotiating, and administering licensing agreements with third parties. Doc. 49-4 at 14. Westmoreland holds the copyrights to his paintings, and GYPI agreed that it would not acquire "any right" in these copyrights. *See id.* at 17. GYPI has no authority to enter into contracts on Westmoreland's behalf, but may present potential agreements to him for his approval. *See id.* at 18. The parties agreed that if Westmoreland elected not to bring an action to enforce his copyrights, GYPI would have the right to do so. *See id.*

Zazzle argues that GYPI cannot sue to enforce Westmoreland's copyrights because it lacks any ownership interest in these copyrights. The Court agrees. Although GYPI is Westmoreland's exclusive representative for soliciting, negotiating, and administering agreements with third parties, it does not have authority to exercise any exclusive right with respect to Westmoreland's works. Without his permission, GYPI cannot reproduce, distribute, or display his paintings or create derivative works. At most, GYPI can negotiate licensing agreements and submit them to Westmoreland for approval. That is not a power to use or authorize the use of the copyrighted works. GYPI's status as Westmoreland's exclusive representative is insufficient to establish statutory standing under 17 U.S.C. § 501(b). *Accord Plunket v. Doyle*, 2001 WL 175252, at *5 (S.D.N.Y. Feb. 22, 2001) (individual's "exclusive management rights" with respect to copyrighted worked were insufficient to establish statutory standing under § 501(b)).

GYPI argues that its position is analogous to that of the licensing agent in *Minden Pictures*, 795 F.3d at 1002. Not so. The licensing agreement there explicitly authorized the licensing agent "to reproduce, and to authorize the reproduction of, the copyrighted photographs." *Id.* at 1003. That right was "unrestricted"—the licensing agent could "distribute . . . and/or exploit the Images . . . *without seeking special permission to do so*." *Id.* at 1000 (emphasis added). GYPI had no comparable authority to use Westmoreland's paintings without his permission.

GYPI also argues that it may proceed under the "Enforcement of Copyrights" provision, which purports to give GYPI "the right to enforce the copyrights as a beneficiary to th[e]

---

[2] A party is considered "the legal or beneficial owner of an exclusive right" if it holds the exclusive right by "assignment, mortgage, exclusive license, or any other conveyance," but not if it holds a mere nonexclusive license. 17 U.S.C. § 101.

Agreement" if Westmoreland declines to do so. But the law in the Ninth Circuit is that "[t]he assignment of the bare right to sue for infringement, without the transfer of an associated exclusive right, is impermissible." *Righthaven*, 716 F.3d at 1169. Because GYPI lacks any exclusive rights in the Westmoreland copyrights, it cannot bring suit under § 501(b).

### C. Erickson Copyrights

Zazzle moves for summary judgment on GYPI's claims for infringement of the Erickson copyrights, arguing that GYPI lacks statutory standing to pursue this claim. In the alternative, Zazzle seeks summary judgment that GYPI is not entitled to statutory damages with respect to certain of the Erickson copyrights.

#### 1. Statutory Standing

The material facts are not in dispute. The Erickson works were created pursuant to agreements between Erickson and Young's d/b/a entities, GYP and GYI. The copyrights in these works were assigned to Young's d/b/a entities. Doc. 71, ¶¶ 39, 41–42, 46, 53–55, 58. However, Young's d/b/a entities are not parties to this case, and (with three exceptions) GYPI failed to obtain written transfers of the Erickson copyrights before initiating this lawsuit.

Zazzle argues that GYPI cannot sue to enforce the Erickson copyrights because at the time of the alleged infringement these copyrights were owned by Young's d/b/a entities, not by GYPI. GYPI counters that it should be allowed to enforce copyrights held by Young's d/b/a entities because Young is GYPI's sole officer, director, and shareholder. Alternatively, GYPI seeks leave to amend to add Young's d/b/a entities as plaintiffs.

The Court agrees that GYPI should be allowed to assert copyright claims belonging to Young's d/b/a entities. As a practical matter, Young is GYPI, just as Young was GYP and GYI. No conceivable purpose is served by a myopic focus on the way Young's business was organized at the time of a particular act of infringement.

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010) is instructive. That case involved copyright claims brought by Ashley Gasper, an adult film star, and Jules Jordan Video, Inc. ("JJV"), a corporation founded by Gasper in which Gasper was the sole officer, director, and shareholder. *Id.* at 1150. The district court held that Gasper, proceeding in his individual capacity, lacked statutory standing to assert copyright infringement claims for certain videos, because he was JJV's employee at the time the videos were created, and the copyrights for these videos would have vested in JJV under the work-for-hire doctrine. *Id.* at 1152.

The Ninth Circuit rejected this analysis as "legally erroneous, inequitable, and illogical." *Id.* at 1155. It explained:

> The problem with the district court's analysis is that JJV was a one-man shop. Gasper was the sole officer, director, and shareholder of JJV, exercised complete control over it, and made all decisions concerning JJV and production of the films. It was all Gasper all the time. JJV as employer and Gasper as employee could certainly agree as to the scope of the employee's employment, and could

>agree that Gasper should retain all copyrights. Since JJV was Gasper, JJV
>intended whatever Gasper intended, and if Gasper intended that his creative work
>be outside the scope of his employment with JJV, there was no one to disagree.

*Id.* at 1156.

The appellate court went on to explain that if the jury were to credit Gasper's testimony that he and JJV always intended for the copyrights to vest in Gasper personally, defendants could not be heard to object that this understanding was never reduced to writing (as is generally required for a transfer of copyright ownership under 17 U.S.C. § 204(a)):

>Section 204(a) is designed to resolve disputes between owners and transferees and
>to protect copyright holders from persons mistakenly or fraudulently claiming oral
>licenses or copyright ownership.  When there is no dispute between the copyright
>owner and transferee, it would be unusual and unwarranted to permit a third-party
>infringer to invoke § 204(a) to avoid suit for copyright infringement.

*Id.* at 1157.

The analysis is the same here.  GYP, GYI, and GYPI were all one-man shops.  It was all Young all the time.  Because Young was the man behind the curtain with respect to all of these entities, he could decide that copyrights owned by any of these entities would be jointly owned by all them, and no one could disagree.  Nor would any third-party infringer have standing to object to the lack of a written instrument confirming Young's understanding.

Even if GYPI were prohibited from asserting copyright claims belonging to Young's d/b/a entities, leave to amend to add these entities as plaintiffs would certainly be appropriate. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely grant leave when justice so requires.").[3] As an alternative to its holding that GYPI is entitled to assert claims belonging to Young's d/b/a entities, the Court deems the operative complaint amended to add GYP and GYI as plaintiffs. *Cf. Dale Carnegie & Assocs., Inc. v. King*, 31 F. Supp. 2d 359, 366 (S.D.N.Y. 1998) ("the complaint is deemed amended . . . to include Dale Carnegie Service Corporation as a plaintiff"); *In re Joint E. & S. Districts Asbestos Litig.*, 124 F.R.D. 538, 540 (E.D.N.Y. 1989) ("the complaint is deemed amended to add Celotex as a party defendant").

---

[3] Zazzle cites cases holding that the court should not grant leave to amend to cure a jurisdictional defect. *See, e.g., Lans v. Gateway 2000, Inc.,* 84 F. Supp. 2d 112, 115 (D.D.C. 1999) ("a plaintiff may not amend the complaint to substitute a new plaintiff in order to cure a lack of jurisdiction, because a plaintiff may not create jurisdiction by amendment when none exists") (citation and quotation marks omitted).  But the alleged defect here is GYPI's purported lack of statutory standing.  That is not a question of jurisdictional significance.  Even if it lacks statutory standing, GYPI would likely be able to establish Article III standing based on the injury to Young, its sole officer, director, and shareholder. *See generally Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977) (setting forth circumstances in which association has standing to sue on behalf of its members); *cf. Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 2016 WL 5946858, at *27 (N.D. Cal. Sept. 30, 2016) (corporation had associational standing based on injury to its employees).

**2. Statutory Damages**

"[T]he owner of copyright or of any exclusive right in the work may obtain registration of the copyright claim by delivering to the Copyright Office" a copy of the work, an application for copyright registration, and the requisite fee. 17 U.S.C. § 408(a). A copyright owner may generally correct information included in its original application if that information was incorrect at the time of the registration. 37 C.F.R. § 201.5(b)(2)(i). A supplemental application must be for "the same work" included in the original registration; a supplemental registration cannot be used "to reflect changes in the content of the work." § 201.5(b)(1), (2)(iii).

Although a copyright owner need not submit a registration in order to enjoy the protections of the Copyright Act, registration expands the remedies available in the event of infringement. Any copyright owner is "entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement" which are not taken included in the damages calculation. 17 U.S.C. § 504(b). If the infringed work was registered with the Copyright Office before the infringement occurred, however, the copyright owner may elect to recover statutory damages in lieu of actual damages and restitution, and may also recover attorney's fees. *See* §§ 412, 504(c)(1), 505.

Zazzle argues that GYPI cannot obtain statutory damages or attorney's fees with respect to 24 of the Erickson paintings. It is undisputed that the original registrations stated that the "nature of the work" was a photolithographic reproduction of a work of art. *E.g.*, Doc. 49-6 at 1. Young subsequently filed supplemental registrations which changed the nature of the work to "mixed media." *E.g.*, *id.* at 51. The parties agree that the original registrations were defective because the photolithographic reproductions were unoriginal and thus not eligible for copyright protection. Zazzle argues that the supplemental registrations were also defective because they were not directed at the same work as the original registrations.

The Court is not persuaded. The original registrations included copies of the Erickson paintings. The supplemental registrations do not claim any new content; they simply correct the *description* of the claimed works to indicate that Young holds copyrights not in the reproductions but in the paintings themselves. Because the supplemental registrations were directed to the same content as the original registrations, the "same work" requirement is satisfied. *Cf. Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*, 2005 WL 67077, at *3–4 (E.D. Pa. Jan. 11, 2005) (this requirement was not satisfied where the original application only included text, but the supplemental application included text *and* photographs).

Zazzle also argues that the supplemental registrations are invalid because none of the information in the original registration was incorrect, and supplemental registrations are only allowed where necessary to fix an error. Again, the Court disagrees. The original applications incorrectly described Young's copyright interest in the Erickson paintings. He owned the copyrights to the paintings themselves, not to the photolithographic reproductions. The supplemental registrations corrected this mistake.

## IV. GYPI'S MOTION

Section 512(c) of the Digital Millennium Copyright Act ("DMCA") creates a safe harbor from copyright liability for service providers—defined as "provider[s] of online services or network access, or the operator[s] of facilities therefor." 17 U.S.C. §§ 512 (c), (k)(1)(B). In general, service providers are not monetarily liable "by reason of . . . storage" of infringing material at the direction of a user, as long as they have no specific knowledge that the material is infringing, and as long as they take expeditious action to remove infringing content upon being receiving a complaint. § 512(c)(1)(A). To be eligible for this safe harbor, a service provider must show that it "did not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." § 512(c)(1)(B). The service provider must also show that it has adopted and reasonably implemented a policy that provides for the termination of repeat offenders, and that it "accommodates and does not interfere with standard technical measures" used by copyright owners to identify and protect their copyrights. § 512(i)(1).

In its answer, Zazzle asserted as an affirmative defense that it was protected by the safe harbor set forth at § 512(c). Doc. 44, ¶ 97. GYPI moves for summary judgment that Zazzle's conduct was not protected by this safe harbor because: (1) Zazzle is not a service provider; (2) Zazzle knew its services were being used to infringe GYPI's copyrights; and (3) Zazzle received a financial benefit from this infringing activity and had the right and ability to control it.

### A. Service Provider

To be eligible for § 512(c)'s safe harbor, a defendant must establish that it is a service provider: "a provider of online services or network access, or the operator[s] of facilities therefor." 17 U.S.C. § 512(k)(1)(B). The definition of "service provider" is very broad; indeed, it is difficult to imagine any online service that the definition would not encompass. *Accord In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 658 (N.D. Ill. 2002). Websites that host user-uploaded images and videos fall under this definition. *See UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1016 (9th Cir. 2013) (Veoh.com is a service provider for purposes of § 512(c)); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 39 (2d Cir. 2012) (YouTube is a service provider for purposes of § 512(c)); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2012) (Photobucket is a service provider). So do commercial websites that allow users to market and sell their products. *See Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1100 (W.D. Wash. 2004) ("Amazon operates web sites, provides retail and third party selling services to Internet users, and maintains computers to govern access to its web sites. These activities fall squarely within the broad scope of the § 512(k)(1)(B) definition of "service provider[.]"); *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1088 (C.D. Cal. 2001) ("eBay clearly meets the DMCA's broad definition of online service provider").

Zazzle alleges that it is a service provider because it "merely operates the Zazzle platform to which users can upload designs at their direction for printing at the direction of these users on products supplied by Zazzle." Doc. 44, ¶ 18; *see also* ¶ 97. GYPI argues that Zazzle is not a service provider because it goes beyond passively accepting and displaying user-submitted images by directly manufacturing and selling physical products bearing the user-submitted

images. The problem with GYPI's argument is that it is wholly unmoored from the statutory text. The statute defines "service provider" to include "a provider of online services." Zazzle operates a website that allows users to upload images to print on various consumer products. Zazzle also sells products bearing images from Disney, Warner Bros., Marvel, and other popular brands. These are unquestionably "online services." It follows that Zazzle is a "service provider" within the meaning of § 512(c).

GYPI relies on *Agence France Presse v. Morel*, 934 F. Supp. 2d 547 (S.D.N.Y. 2013) in arguing otherwise. As GYPI itself recognizes, *Morel* is "a notable exception to most DMCA cases" in treating the definition of "service provider" as a meaningful restriction on the applicability of § 512(c)'s safe harbor. Doc. 50-1 at 18. *Morel* is an outlier for a reason: its analysis is not persuasive. The court in *Morel* reasoned that Congress must have intended its definition of service provider "to impose some limitation on the availability of the § 512(c) safe harbors," or it would not have provided such a definition at all. *Morel*, 934 F. Supp. 2d at 565. That premise is faulty. Congress will often define a term because it wants the term to carry a *broader* meaning than it would in ordinary parlance,[4] or because it wants to emphasize that it is rejecting an implied limitation that might otherwise be imported from another area of law. Nothing about the definition of "service provider" in § 512(k)(1)(B) supports the notion that it was intended as a limitation on § 512(c)'s safe harbor.

In any event, *Morel* is inapposite. *Morell* held that, to be entitled to the protections of § 512(c), a website must be "engaged in facilitating or supporting online access or the activities *of users* of the internet." *Id.* at 567 (emphasis added). The court suggested that a defendant would not be eligible for the safe harbor if the evidence showed that the defendant *itself* uploaded the content in question pursuant to a claimed license in that content. *Id.* at 567–68. That is plainly not what happened here. There is no dispute that the GYPI images that appeared on Zazzle where uploaded by third-party users.

GYPI also relies on *Gardner v. CafePress Inc.*, 2014 WL 794216 (S.D. Cal. Feb. 26, 2014), which the Court also finds to be unpersuasive. In *Gardner*, the court reasoned that although e-vendors like Amazon, eBay, and PhotoBucket are service providers," CafePress—a company with the same basic business model as Zazzle—was not, because it went "beyond facilitating the sale of products between internet users by directly selling products to online shoppers." *Id.* at *5. The problem with this argument is that, as a logical matter, a company does not cease to be "a provider of online services" because it offers offline services as well. There is nothing in the statutory text or in Ninth Circuit precedent that suggests an entity must be *primarily* engaged in providing online services to benefit from § 512(c)'s safe harbor. The Court will not impose such a requirement by implication.

### B. Knowledge

A service provider is not eligible for § 512(c)'s safe harbor if it has "actual knowledge that the material or an activity using the material on the system or network is infringing," or, if

---

[4] *See, e.g.*, 42 U.S.C. § 9601(21) (for purposes of CERCLA, "[t]he term 'person' means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body.").

"in the absence of such actual knowledge," it is "aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A) (i)–(ii). The constructive knowledge clause has been construed so narrowly in the Ninth Circuit that it is questionable whether it retains any independent meaning. *See UMG Recordings*, 718 F.3d at 1023–25 (9th Cir. 2013) (notwithstanding constructive knowledge clause, service providers do not forfeit protection of § 512(c)'s safe harbor unless they have "specific knowledge of particular infringing activity" and fail to take corrective action); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007) (refusing to impute constructive knowledge of infringement to defendant who hosted websites named "illegal.net" and "stolencelebritypics.com"). A service provider will not be found to have knowledge of infringement unless (1) the copyright holder submits a complaint that complies with the DMCA's procedural requirements (a deficient notice cannot be used to establish knowledge); or (2) a third-party submits a sufficiently specific complaint about potential infringement. *See UMG Recordings*, 718 F.3d at 1025.

GYPI argues that Zazzle knew its users were uploading GYPI's images because GYPI complained about this infringement and provided Zazzle with a catalogue of its images to be used to check for future incidents of infringement. Even if that is true, it does not render Zazzle ineligible for the protection of § 512(c)'s safe harbor. GYPI offers no evidence that Zazzle had "specific knowledge of particular infringing activity" and nonetheless failed to take corrective action with respect to that activity.

### C. Financial Benefit with Ability to Control

To be eligible for § 512(c)'s safe harbor, a service provider must show that it "did not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). Zazzle does not dispute that it received a financial benefit directly attributable to infringing activity when it sold physical products bearing GYPI's images. Doc. 69 at 26. The only question is whether Zazzle had "the right and ability to control" this activity.

A service provider will not be found to have "the right and ability to control" infringing activity simply because it has the general ability to remove infringing material and terminate the accounts of repeat infringers. *UMG Recordings*, 718 F.3d at 1030. Nor does "limited monitoring . . . for 'apparent' infringements" amount to such a right. *Hendrickson*, 165 F. Supp. 2d at 1094. Rather, the service provider will not be found to have the right and ability to control the activities of its users unless it exerts "substantial influence" over these activities. *UMG*, 718 F.3d at 1030. Such influence will be found where the service provider plays an active role in selecting, monitoring, or marketing user content. *Id.* (citing *Viacom*, 676 F.3d at 38); *see also Hendrickson*, 165 F. Supp. 2d at 1030 (e-commerce website might be found to have "the right and ability to control" the sale of infringing content if it was "actively involved in the listing, bidding, sale and delivery of any item offered for sale on its website"); *Corbis Corp.*, 351 F. Supp. 2d at 1110 (e-commerce website might be found to have the right and ability to control if it was "in possession of the products" sold by its users or if it "preview[ed] the products prior to their listing . . . edit[ed] the product descriptions . . . suggest[ed] prices . . . or otherwise involve[d] itself in the sale"); *Gardner*, 2014 WL 794216, at *9 (reasonable jury could find that CafePress had right and ability to control where facts showed it was "actively involved in the listing, sale, manufacture, and delivery of items offered for sale in its Marketplace").

GYPI argues that Zazzle had "the right and ability to control" the sale of infringing products because "it is actively involved in selecting the products that are sold, pricing those products, selling the products, manufacturing the products, inspecting the products, and finally packaging and delivering the products." Doc. 50-1 at 27. Zazzle does not dispute that it engages in these activities. The Court concludes that Zazzle had the right and ability to control the types of products it produced. Unlike eBay or Amazon, Zazzle's role is not limited to facilitating the sale of products owned and marketed by third parties. Zazzle *creates* the products. If Zazzle lacks the right and ability to control the sale of products it creates, it is hard to imagine any defendant that *would* have such a right.

Zazzle argues that it lacked the ability to control the sale of infringing products because, in practice, "the production process was effectively automatic . . . after a product was ordered and approved by Zazzle's CMT [content management team]." Doc. 69 at 25. That is a non-sequitur. It doesn't matter if Zazzle lacked the ability to control its production process *after* CMT approved the product; presumably CMT had the authority to reject products that were infringing. More to the point, even if the entire process were automatic, that would suggest at most that Zazzle had chosen not to exercise its right and ability to reject infringing products, not that it *lacked* the right or ability to do so. GYPI is entitled to summary judgment that Zazzle is not protected under § 512(c) to the extent it manufactured and sold physical products bearing infringing images. This ruling does not preclude Zazzle from invoking § 512(c) with respect to images that were displayed on its website but never printed onto physical products. It is not clear that Zazzle received a financial benefit from merely displaying images on its website, or that Zazzle had the right or ability to control the types of images its users uploaded.

## V. CONCLUSION

Zazzle's motion for summary judgment (Doc. 49) is GRANTED IN PART and DENIED IN PART. GYPI lacks standing to enforce the Westmoreland copyrights; any infringement claim based on these copyrights is dismissed. However, GYPI has standing to enforce the Erickson copyrights. In attempting to enforce these copyrights, GYPI may elect to pursue statutory damages and attorney's fees.

GYPI's motion for partial summary judgment (Doc. 50) is GRANTED IN PART and DENIED IN PART. To the extent it manufactured and sold physical products bearing infringing images, Zazzle is not protected under 17 U.S.C. § 512(c). But Zazzle may invoke this safe harbor to the extent GYPI seeks to impose liability based solely on the unauthorized display of copyrighted images on Zazzle's website.

**IT IS SO ORDERED.**